**NORTHERN TELECOM INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Rolm Corporation,
Defendant-Intervenor.**

No. 290–85C.

United States Claims Court.

June 27, 1985.

John A. McCahill, Washington, D.C., for plaintiff; Mary E. Bosco, Washington, D.C., of counsel.

Mary Mitchelson, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant.

Neil H. O'Donnell, San Francisco, Cal., for defendant-intervenor; Allen C. Peters, Washington, D.C., of counsel.

## OPINION

MARGOLIS, Judge.

On May 15, 1985 the plaintiff, Northern Telecom Inc. (NTI), sued for a temporary restraining order and a preliminary injunction to prevent the National Aeronautics and Space Administration (NASA) from awarding a contract to the defendant-intervenor, ROLM Corporation (ROLM). Since NASA has agreed not to award the contract until July 1, 1985, the request for a temporary restraining order is moot. Both the defendant and the intervenor oppose the plaintiff's motion for an injunction, and the defendants have moved for summary judgment. After hearing oral argument and considering the entire record, the Court grants the defendants' motion for summary judgment and denies the plaintiff's motion for a preliminary injunction.

## FACTS

### A. *The Procurement*

On September 22, 1983 NASA issued Request for Proposal No. 9BB52–54–3–96P (the RFP), which invited proposals to supply, install, and maintain a new Center Telecommunications System (CTS) at the Lyndon B. Johnson Space Center in Houston, Texas (the JSC). The RFP also gave NASA the option to order a system for the JSC Aircraft Operations Division at Ellington Air Force Base in Houston. NASA hopes to use the voice capability of the new system within twelve months after signing the contract. The awardee must deliver and install the entire system within 510 days after the contract is awarded.

Seven firms submitted proposals. The Source Evaluation Board (SEB)[1] ranked the proposals according to four criteria specified by the RFP: 1) Mission Suitability; 2) Cost; 3) Company Experience and Past Performance; and 4) Other Factors. The Mission Suitability criterion comprised ten subcriteria, which were each assigned a weight of "most important," "very important," or "important." The subcriterion "System Design and Features" was ranked as one of the two "most important." The RFP defines this subcriterion as follows:

### 3.1 SYSTEM DESIGN AND FEATURES

All equipment furnished by the Contractor shall be new, of modern design, and a current, standard-production model of the manufacturer. The system shall be of a size, type, architecture, and capability (including both voice and data capability) that has previously been successfully installed and operated.

All the components of the system must be field-proven (specifically or generically) and must currently be marketed by the manufacturer as off-the-shelf products. A component will be considered to be specifically field-proven if it has been installed on three or more field systems and has performed in a satisfactory, trouble-free manner. A component will be considered to be generically field-proven if it is an upgraded or improved version or model of a component which has been specifically field-proven, and is currently being marketed by the manufacturer as a standard commercial product.

After initial evaluation, the SEB excluded three firms that had submitted proposals beyond the competitive range. The four remaining bidders then clarified their proposals in oral and written discussions with the SEB. On October 16, 1984 the bidders submitted best and final offers.

In the final evaluation, the ROLM proposal scored highest in all Mission Suitability subcriteria and was rated excellent in every major criterion. The NTI proposal was ranked second in Mission Suitability, though ROLM had such a substantial edge that the Source Selection Official considered the NTI proposal no further. Instead, he weighed the technical excellence of the ROLM proposal against the cost advantage offered by American Telephone and Telegraph. On January 16, 1985 NASA announced that it would negotiate a contract with ROLM for about 14 million dollars, with ten one-year extensions for maintenance, operations, and future expansion costs.

### B. *The ROLM System*

In the ROLM telephone system, Computerized Branch Exchanges (CBX's) direct calls from user to user. Calls entering a switch terminate on electronic circuit cards and must be transferred to other lines to reach their destinations. The cards are stacked on shelves. Each cabinet contains six shelves, and each CBX switching node contains three cabinets.

A shelf can switch a call only between lines on that shelf. To pass from one shelf to another, the call must travel along a special circuit card (expander) to the system backplane (ROLMbus). To pass between nodes, the call must travel through a fiber-optic internode link (INL). ROLM plans to use a centralized internode network (INN) to connect nodes in systems requiring 4,000 or more lines.

ROLM proposed to install a system at the JSC that comprises a CBX II 9000 using thirteen nodes. Each node will utilize the ROLMbus 295 and will connect with an INN. ROLM proposed INL's as the primary internode traffic links of the CBX II. To operate the system, ROLM offered its Software Release 9003 and promised to provide updated releases as they become available. To meet other requirements of the RFP, ROLM proposed the following specialized equipment: its Asynchronous/Synchronous Data Commu-

---

**1.** The SEB was composed of seven NASA employees, who along with four advisors worked full-time for over one year on this procurement.

nications Module (DCM); CBX II T1/D3 interface cards; the CBX II X.25 interface; and a CBX M/A switching system.

## C. *The NTI Protest*

On February 12, 1985 NTI protested NASA's selection of ROLM for probable award on the ground that the proposed system was not field-proven. NTI makes the following charges: Some major components were not commercially available at the bidding deadline. ROLM had installed the CBX II 9000 but had paired it with the ROLMbus 74, a system backplane that could not meet NASA's requirements. To date ROLM has installed only one experimental system using the CBX II 9000 with the ROLMbus 295. ROLM has never connected such a system to the proposed INL and INN, and the plaintiff alleges that ROLM is still testing the INN.

The Contracting Officer investigated the charges and met with ROLM representatives from March 18–22, 1985. By letter to NTI dated April 4, 1985, he found

> that the particular equipment alleged not to be field-proven (the Rolm CBX II 9000 with the Rolmbus 295 feature and the INN) are both upgrades of and improvements to Rolm equipment that is specifically field-proven, and that both of these items of equipment were being marketed by Rolm as standard commercial products at the time the company submitted its proposal to JSC for the CTS. Both items are therefore generically field-proven as required by the RFP.
>
> ... Note that the RFP required that the equipment *furnished* must be current standard-production equipment; it did not require that the equipment meet this condition at the time of proposal submission. It was the Government's intent, as expressed in the RFP, to obtain state-of-the-art equipment; i.e., equipment that would not be phasing into middle age or obsolescence at the time of delivery and installation. By requiring that products proposed be generically field-proven and that the equipment furnished be standard-production items, the Government

maximized its opportunity to obtain the most modern equipment available, consistent with its desire to avoid the risks associated with developmental equipment and tailor-made, one-of-a-kind items....
As noted above, both the ROLMbus 295 and the INN are generically field-proven, and both are being marketed today as standard commercial products. I have accordingly concluded that ROLM's proposal met the requirements of paragraph 3.1 of the RFP.

The Contracting Officer also rejected NTI's allegation that certain specialized equipment could not meet NASA's needs. He denied the protest.

In this suit, NTI repeats the charges it raised before the Contracting Officer.

## DISCUSSION

### A. *Standard of Review*

Congress gave this court exclusive power to enjoin the award of government contracts. 28 U.S.C. § 1491(a)(3) (1982). But the court may use that power "only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials...." S.Rep. No. 275, 97th Cong., 1st Sess. 23, *reprinted in* 1982 U.S.Code Cong. & Ad.News 11, 33.

■ Therefore, to persuade the court to change a procurement decision, an aggrieved bidder must demonstrate with clear and convincing evidence that the agency's determination either lacks any rational basis or violates applicable statutes or regulations to the bidder's prejudice. *International Mailing Systems v. United States,* 6 Cl.Ct. 762, 765 (1984); *accord Big Bud Tractors, Inc. v. United States,* 2 Cl.Ct. 188, 193, *aff'd mem.,* 727 F.2d 1118 (Fed. Cir.1983).

NTI alleges both that NASA violated procurement regulations and that NASA's reading of the RFP is irrational.

### B. *Alleged Violation of Procurement Regulations*

■ Federal Acquisition Regulations provide:

When, either before or after receipt of proposals, the Government changes, relaxes, increases, or otherwise modifies its requirements, the contracting officer shall issue a written amendment to the solicitation.

48 C.F.R. § 15.606(a) (1984); *see also In re Corbetta Construction Co.,* 55 Comp.Gen. 201, 207 (1975) ("It is a fundamental principle in Government procurement ... that the contract awarded [must be] the contract that bidders or offerors have competed for.").

NTI alleges that the RFP required offerors to propose "a CTS which was commercially available and which previously had been successfully installed and operated." *Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction* at 2. According to NTI, NASA waived the system-experience and field-proven requirements for ROLM, but never issued a written amendment to permit other bidders to offer new product lines. Had the Contracting Officer obeyed the regulation, NTI suggests that it might have proposed its own Meridian line, which it first announced in February of 1985. Therefore, NTI claims to be entitled to an injunction.

But NTI bases its argument upon the "System Design and Features" section, read in isolation. According to NTI, that section set out conditions that offerors were obliged to meet—and were obliged to meet at the time they submitted proposals. The RFP, however, put bidders on notice that NASA did not condition the contract award on compliance with any one section:

> 3.1 Mission Suitability Factors.... Because they can be highly technical, and are relatively numerous, and must be integrated in order to convey an *overall evaluation of relative merit,* Mission Suitability Factors are numerically weighted and scored.
>
> ....
>
> 4.1.1 Satisfying System Requirements. This factor will be used to assess the *degree to which* the offeror's pro-

posed system will satisfy the JSC requirement for a CTS.

(emphasis added).

The Chairman of the SEB has shown that no bidder could have met all the system requirements. *See Affidavit of Clyde Waters* at 2. Therefore the SEB followed the policy announced in the RFP; it "evaluated proposals in accordance with the factors and criteria in the RFP, and made assessments of the *relative* merit of *each* proposal under each factor or criterion, as applicable." *Affidavit of Gerald D. Griffin* at 2 (emphasis added). NASA rated all the offerors by the degree to which their proposals met all the standards. NASA waived no requirement and violated no regulation.

## C. Alleged Lack of Rational Basis

Even if NASA judged each offeror by all the RFP criteria, NTI argues: 1) that the criteria cannot mean what NASA says they mean; and 2) that NASA's interpretation defeats the purpose of the procurement.

### 1) *Interpretation of "Marketing"*

■ The RFP provides: "All the components of the system ... must currently be marketed by the manufacturer as off-the-shelf products." Each component must also be field-proven, and a generically field-proven component must "currently [be] marketed by the manufacturer as a standard commercial product." ¶ 3.1 System Design and Features. ROLM's own Product Availability Notice schedules the first INL shipment in October of 1985; the ROLMbus 295 INL component will not be commercially available until the first quarter of 1986. Therefore, according to NTI, these components were not marketed as standard commercial products when ROLM proposed them.

But a ROLM official has shown by uncontradicted affidavit that ROLM announced the ROLMbus 295, the INL, and the INN in November of 1983. By the time ROLM proposed the CTS to NASA, ROLM "had made dozens of proposals for systems with CBX II 9000 switches utiliz-

ing ROLMbus 295 and INL.... [and] a number of proposals incorporating the INN as well." *Declaration of William H. Warren* at 6–7.

NASA concluded that ROLM had marketed the components as standard commercial products even though many were not yet available. The Court agrees. The Ninth Circuit has noted:

> We think the term *marketing* is far broader than the word *sell*. A common definition of "marketing" is this: "The aggregate of functions involved in transferring title and in moving goods from producer to consumer, including *among others* buying, selling, storing, transporting, standardizing, financing, risk bearing, and *supplying market information*."

*Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc.,* 497 F.2d 203, 215 (9th Cir.), *cert. denied,* 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974) (emphasis in original) (quoting *Webster's New Collegiate Dictionary* (1953 ed.)). The word is broad enough to bear the meaning NASA gave it.

### 2) *Purpose of the Procurement*

NASA is willing to accept components that will be standard production models when *furnished,* twelve to eighteen months after the contract date. NTI argues, however, that NASA's policy is irrational:

> If it turns out that the awardee cannot in fact develop an operating system of a similar size, type, architecture, and capability before system cutover time in 1986 or 1987, NASA will not be able to ascertain that fact until 1986 or 1987. By then, it will be too late. The contract will have long been awarded, but NASA will not have an operating CTS system which meets its needs.

*Memorandum of Points and Authorities in Opposition to Defendant's and Defendant-Intervenor's Motion for Summary Judgment* at 12.

■ But NASA determined that 1984's experienced system will be obsolete in 1987. NASA preferred to order 1987's experienced system. It is not irrational for a procuring agency to balance its need for the newest technology against the risk of late delivery or imperfect equipment, and to find that risk acceptable. If ROLM should default, NASA will have a remedy. *See, e.g., In re E.C. Campbell, Inc.,* B–204253 (Feb. 2, 1982), 82–1 CPD ¶ 76, p. 3 ("Protests, like this one, alleging that the awardee will not deliver equipment in conformance with contract requirements concern matters of contract administration, which are the responsibility of the contracting agency and which are not considered under our bid protest function.").

### D. *Propriety of Summary Judgment*

■ NTI asserts that factual questions preclude summary judgment in this case. For example, all components must be field-proven. A generically field-proven component is an upgraded or improved version of an existing standard commercial product. NTI alleges that the ROLMbus 295 works on a different principle from the existing ROLMbus 74. ROLM answers that only 10% of the 295 model's hardware is new. NTI counters that the new hardware is the "guts" of the system and insists that the Court must determine if the ROLMbus 295 simply improves upon the ROLMbus 74 or constitutes a new product.

Even if this question is material, it has already been answered. NASA decided that ROLM's proposed components are improvements of existing components. NASA relied on substantial evidence. It is irrelevant that the plaintiff's expert—or the Court—might decide differently. The Supreme Court has remarked:

> [W]hen we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on "engineering and scientific" considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis

unless it is without substantial basis in fact.

*FPC v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 644, 30 L.Ed.2d 600 (1972).

## CONCLUSION

NTI also asserts that certain specialized equipment failed to meet NASA's needs. NASA found that the challenged equipment meets its needs to an acceptable degree. The Court accepts NASA's reasoning. NTI has raised other arguments. The Court has weighed them all and found them wanting.

The record presents no genuine issue of material fact.[2] The defendants are entitled to judgment as a matter of law. The Clerk will dismiss the complaint.

---

**2.** At oral argument the plaintiff pressed a point that it had not alleged specifically in its complaint and that it first raised in a brief filed three days before the hearing. During a procurement for the NASA Goddard Space Center, ROLM had admitted: "At the present time, ROLM ... has not identified a market for multi-party connection (analogous with [existing] voice conferencing) for data users and therefore research and development money in the past has not been set aside for that project."

NTI asserts that the Source Selection Official gave an "excellent" rating to ROLM's multi-party data system. The system does not exist. Therefore, the Official acted irrationally. The defend-

ant complains that it had no time to answer this argument.

No answer is necessary. On May 6, 1985 the Source Selection Official wrote: "The ROLM system clearly offers the greatest *potential* of satisfying the Center's requirements, particularly in the area of multi-party data handling...." (emphasis added). NASA could rationally evaluate a proposed component that is not yet commercially available if that component improves upon an existing product. Whether the proposed multi-party data system improves upon an existing conferencing system is a technical question that NASA has answered and that the Court will not reexamine.