ACTION MANUFACTURING
COMPANY

v.

The UNITED STATES and Rexon
Technology Corporation,
Defendant/Intervenor.

No. 402–86C.

United States Claims Court.

July 16, 1986.

Marc Lamer, Philadelphia, Pa., for plaintiff.

David Stinson, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

Peter F. Garvin, Washington, D.C., for defendant/intervenor.

## OPINION

SETO, Judge.

In this pre-award bid protest case filed pursuant to 28 U.S.C. § 1491(a)(3), plaintiff

Action Manufacturing Company ("Action"), seeks a temporary restraining order and preliminary and permanent injunctive relief to prohibit the United States Army Armament Munitions and Chemical Command ("AAMCCOM") from awarding a contract under Request for Proposal No. DAAA09–85–0744 ("RFP") to anyone other than Action. The underlying issue is whether the relevant actions of AAMCCOM's procurement officials, during the negotiation process, lacked a rational or reasonable basis.

## BACKGROUND

On June 24, 1986, plaintiff filed a motion for a temporary restraining order ("TRO") and a motion for a preliminary injunction, together with a complaint, which sought a preliminary injunction enjoining defendant from awarding a contract under RFP to any offeror other than plaintiff. Plaintiff, Action Manufacturing Company, asserts that its offer was the low, responsive, responsible one and that it is entitled to an award of a contract under the RFP. On June 25, 1986, the court held a hearing on plaintiff's motion for a temporary restraining order, at which time defendant/intervenor, Rexon Technology Corporation, also appeared. Pursuant to this hearing, the court issued a temporary restraining order, effective for ten days, restraining defendant, acting through the U.S. Army Armament Munitions and Chemical Command, from awarding the subject RFP to any other offeror other than plaintiff until this court rules on plaintiff's motion for a preliminary injunction. At that hearing, defendant agreed not to award said RFP to any other offeror other than plaintiff until this court renders its decision on July 16, 1986. The court alerted all parties that it would hold a hearing on the merits on July 9, 1986; combine the motion for preliminary injunction with the motion for a permanent injunction; and hear all witnesses and evidence adduced by plaintiff, defendant, and defendant/intervenor. A full-day hearing was held on July 9, 1986. At this hearing; plaintiff adduced two witnesses and six exhibits; defendant adduced two witnesses and no exhibits; and plaintiff

and defendant agreed upon ten joint exhibits.

Action is a Pennsylvania corporation located in Philadelphia, Pennsylvania. Action is in the business of manufacturing various armament and munition related items for the United States government. Defendant is the United States acting through its agent, AAMCCOM. Defendant/intervenor is Rexon Technology Corporation ("Rexon") located in Wayne, New Jersey. Rexon is in the business of manufacturing fuzes and safety arming devices, primarily for the United States government. On August 9, 1985, AAMCCOM issued a RFP which, as originally issued, related to the acquisition of 413,058 fuze PDM 739A MPTS (fuzes) units and 51,629 S & A mod assembly, F/155 M285 (mod assembly) units. The RFP was issued and conducted pursuant to competitive negotiation and restricted procurement to only mobilization base producers.

The delivery schedule under the contract requires the first deliveries of fuzes 360 days after the award of the contract. Deliveries are to continue on a monthly basis (approximately 30,000 per month) until 690 days after award of the contract. Delivery of one-half of the mod assemblies is required 360 days after award, completion of delivery of the remaining half is to occur 390 days after award. The contract permits 240 days for the completion of the first article testing if it is required.

Clause H–13 of the RFP permits offerors to propose the use of Government Furnished Equipment ("GFE") in the pricing of their offers requiring offerors to state whether the offer is predicated upon the use of government furnished equipment. Where the contractor intends to use GFE, it must obtain written authorization from the procuring contracting officer with responsibility for the equipment.

Clause M–6 of the RFP sets forth a detailed evaluation formula to be used in the evaluation of offers predicated upon the use of GFE. Inasmuch as offerors using GFE have lower capital expenditures

because they possess government property, a use evaluation factor is added to the unit cost of the fuzes and mod assemblies, if GFE is to be used. The use evaluation factor is intended to equalize any potential economic advantage that an offeror using GFE has over an offeror not using GFE. The use evaluation factor discussed in Clause M–6 of the solicitation is computed based on the amount of GFE that an offeror is planning to use in the performance of the contract. This figure, however, is not developed by the government, but rather is unique to each offeror and developed by each particular offeror.

Proposals under the RFP were due to be received by September 10, 1985. Action submitted a timely proposal on September 27, 1985, which was *not* based on the use of GFE. Because Action did not contemplate the use of GFE, no evaluation factor was added to Action's unit price. Action's initial proposal was made on an "all or none" basis, meaning that the offeror would accept only a complete award for all the quantities solicited.

After submission of proposals in September 1985, but before an award of the contract was made, the government's requirements for fuzes and mod assemblies changed. The quantity of fuzes was increased to 456,904, and the quantity of mod assemblies was decreased to 37,416. On January 17, 1986, the contracting officer sent telegraphic messages ("TWXs") to each of the offerors advising them of the change in quantities required under the contract and requesting each offeror to submit best and final offers ("BAFO"). The January 17, 1986 TWX contained the following language:

> Request that this office be provided a written best and final offer in accordance with the terms and conditions established in the solicitation as *modified by the following quantity changes* .... (Emphasis supplied.)

Action submitted its first BAFO on January 31, 1986 and confirmed that its first BAFO was in accordance with the solicitation and the telegraphic notice of changed quantities. Action's first BAFO was not predicated on the use of GFE as no GFE evaluation factor was included. Rexon's first BAFO, on the other hand, was based on the use of GFE and included a revised GFE evaluation factor.

The contracting officer determined that the first BAFO submitted by Rexon, which was premised on the use of GFE, was unclear to the extent that it was impossible to accurately apply the use evaluation factor. The problem centered on whether the use evaluation factor was to be applied to both items and whether the amount of the use evaluation factor was the same for both items in the solicitation. The contracting officer determined that, because of the problem with Rexon's first BAFO, an additional round of negotiations and a second BAFO was necessary. The contracting officer further determined that the second BAFO was necessary to confirm that Action was not planning to use GFE, despite their access to it.

Following the contracting officer's decision to issue a request for a second BAFO, the contracting specialist handling the procurement contacted both Action and Rexon by telephone on February 25, 1986 to apprise them that AAMCCOM was requesting new BAFOs due on February 28, 1986. During the telephone conversation on February 25, 1986, plaintiff was informed that the new BAFO was necessary to "clarify an ambiguity with regard to government furnished equipment." On February 26, 1986, the contracting officer sent a TWX to both Action and Rexon requesting a second BAFO. Each TWX contained the following language:

> Request that this office be provided a second best and final offer in accordance with the *terms and conditions established in the solicitation.* (Emphasis supplied.)

A portion of the text of the messages sent to Action and Rexon differed. In particular, the February 25, 1986 TWX to Action included the following language:

> *It is required* that you state in writing that no government furnished equipment

will be used in the performance of this contract. (Emphasis supplied.)

The February 25, 1986 TWX to Rexon, however, included the following language, in lieu of the language quoted hereinbefore to Action:

> It is required that you state in writing the GFE factor for each CLIN (001 and 002) and the figures used in the compilation of the factors. (Emphasis supplied.)

The contracting officer included this language in Rexon's TWX because Rexon had predicated its previous offers on the use of GFE.

Action interpreted their February 25, 1986 TWX as an amendment of the original RFP, eliminating entirely the option of using GFE in performing the contract, thereby eliminating Rexon as a competitor with respect to this RFP, resulting in Action being a sole source offeror. Proceeding on its belief that no offeror could utilize GFE in formulating its second BAFO in response to the February 25, 1986 TWX, Action submitted its BAFO in a timely manner and stated in writing that it would not use GFE.

On February 26, 1986, Action protested the second BAFO to the Comptroller General. In its protest, Action voiced its concern that the second request for BAFO was an attempt to allow an offeror, who had previously indicated it would use GFE, to eliminate its use, thus avoiding having to add the evaluation factor to its offer, and rendering it the low bidder. The Comptroller General of the United States denied Action's protest on June 12, 1986.

Subsequently, plaintiff, Action Manufacturing Company, filed its motion for a temporary restraining order and preliminary injunction in this court on June 24, 1986.

## DISCUSSION

In order for plaintiff to prevail in this action, the court must answer the following question in the affirmative: (1) did the relevant actions of AAMCCOM's procurement officials, during the negotiation process, lack a rational or reasonable basis? Sub-

sumed under this issue, are two subsidiary issues: (a) was Action's interpretation of the February 25, 1986 TWX, reading it as an amendment to the solicitation precluding all offerors from using government furnished equipment, a reasonable interpretation based on the evidence before it; and (b) did the government amend the RFP to prohibit the use of government furnished equipment.

The gravamen of plaintiff's contention is that defendant's actions, in negotiating with plaintiff and Rexon Technology Corporation, were procedurally violative of FAR 15.402(b) and therefore lacked a rational or reasonable basis. Plaintiff cites FAR 15.-402(b), which in pertinent part states, the:

> contracting officer shall furnish identical information concerning a proposed acquisition to all prospective contractors. Government personnel shall not provide the advantage of advanced knowledge concerning a future solicitation to any prospective contractor.... (Emphasis supplied.)

### Actions of AAMCCOM's Procurement Officials

Plaintiff contends, inter alia, that the contracting officer's February 26, 1986 TWX to both Action and Rexon requesting a second BAFO, violated FAR 15.402(b) and therefore lacked a rational or reasonable basis. Each TWX contained the following language:

> Request that this office be provided a second best and final offer in accordance with the terms and conditions established in the solicitation. Quantities, as modified under the first best and final request, dated January 17, 1986, remain unchanged.
>
> \* \* \* \* \* \*
>
> If any modification is submitted, it must be received by the day and time specified and is subject to the late submissions, modifications and withdrawals of proposals or quotations provision of the solicitation. (Emphasis supplied.)

A portion of the text of the TWXs sent to Action and Rexon differed. In particular, the February 25, 1986 TWX to Action including the following language:

> It is *required* that you state in writing that no government furnished equipment will be used in the performance of this contract. (Emphasis supplied.)

The February 25, 1986 TWX to Rexon, however, including the following language, in lieu of the language quoted hereinbefore telegraphed to Action:

> It is *required* that you state in writing the GFE factor for each CLIN (001 and 002) and the figures used in the compilation of the factors. (Emphasis supplied.)

Action asserts that, pursuant to FAR 15.-402(b), Rexon and Action should have received identical TWXs on February 25, 1986. Plaintiff contends, therefore, that it was substantially prejudiced to the extent it did not receive the same information Rexon received; that this action was violative of FAR 15.402(b); and therefore, *a priori,* defendant's actions herein were unreasonable and without a rational basis.

Defendant countervails by arguing that because the procedural actions attacked by plaintiff are subsumed under the heading of negotiations, FAR 15.000 *et seq.,* and because the specific FAR regulation defendant is alleged to have violated, FAR 15.402(b), is subsumed under part 15 of 48 C.F.R. entitled "Contracting by *Negotiation*", that contracting officers, during such negotiations, are allowed broad discretion in such negotiation processes. (Emphasis supplied.) Therefore, its procurement actions pursuant to this RFP were proper under this broad discretionary power.

■ In analyzing whether or not defendant's actions were irrational or without a reasonable basis, the court must be cognizant that judicial intrusions into the procurement process should be "limited and circumspect and infrequent". *Baird Corp. v. United States,* 1 Cl.Ct. 662 at 664. As this court has recently explicated:

> In essence the plaintiff must show that there is *no reasonable basis* ... or that

the procurement procedure involves a *clear and prejudicial violation* of the applicable statute or regulations. (Emphasis supplied.)

*Olympia USA, Inc. v. United States,* 6 Cl.Ct. 550, 554. Thus, to prevail on the merits, plaintiff must demonstrate that *"the relevant actions* of the procurement officials involved *lacked a rational or reasonable basis."* (Emphasis supplied.) *F. Alderete General Contractors, Inc. v. United States,* 4 Cl.Ct. 482, 493, citing *M. Steinthal & Company v. Seaman's,* 455 F.2d 1289, 1301 (D.C.Cir.1971); *Baird Corp. v. U.S.,* 1 Cl.Ct. 662 at 664. Moreover, the deference accorded all procurement official's discretionary determinations must be given even greater weight because the award of a negotiated procurement is at stake. *See, e.g., Demat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983) *quoting Keco Industries, Inc. v. Laird,* 318 F.Supp. 1361, 1364 (D.D.C.1970). *See also Drexel Heritage Furnishings v. United States,* 7 Cl.Ct. 134 at 142, 143 (1984), *quoting Keco Industries, supra.* In addition, "the degree of proof necessary to overturn procurement determinations is related to the amount of discretion vested in the administrative official whose actions are being challenged." *Hayes International Corp. v. United States,* 7 Cl.Ct. 681, 685 (1985). In a negotiated procurement, we must also recognize that "contracting officials have been accorded broad discretion in the process of obtaining the contract most beneficial to the government." *Id., citing* 48 C.F.R. 15.610 (1985); *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339–40, 548 F.2d 915 (1977). Therefore, any review of "any aspect of a negotiated procurement is, as a general proposition, limited in scope." *Hayes International,* 7 Cl.Ct. at 685. Thus, it is clear beyond cavil that Action's burden is even more weighty because it is challenging a contracting officer's discretionary decision to conduct negotiations and to request BAFOs.

■ Federal Acquisition Regulation, 15.610(b) reads in pertinent part:

[T]he contracting officer shall conduct written or oral discussion with all responsible offerors who submit proposals within the competitive range. The content and *extent of the discussions is a matter of the contracting officer's judgment based on the particular facts of each acquisition.*

\* \* \* \* \* \*

c. *The contracting officer shall—*

\* \* \* \* \* \*

(3) *attempt to resolve any uncertainties concerning* the technical proposal and other *terms and conditions of the proposal;*

(4) *resolve any suspected mistakes* by calling them to the offeror's attention as specifically as possible without disclosing information concerning (d) other offeror's proposals or the evaluation process....

\* \* \* \* \* \*

d. The contracting officer and other government personnel involved shall not engage in—

\* \* \* \* \* \*

(2) technical transfusion (i.e., government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal); or

(3) auction techniques, such as—

(iii) otherwise furnishing information about other offeror's prices. (Emphasis supplied.)

Thus, it can be seen from the above FAR regulation, that the contracting officer has broad discretion when dealing with negotiations between the government and offerors. Moreover, this broad discretion extends to any action undertaken by the contracting officer to "resolve any uncertainties concerning ... terms and conditions of the proposal." FAR 15.610(c)(3). In the instant case, the text of TWX messages sent to Action and Rexon differed. In particular, the February 25, 1986 TWX to Action included the following language:

It is required that you state in writing that no government furnished equipment will be used in the performance of this contract.

Evidence was adduced at trial, however, that the contracting officer included this language in Action's TWX because he wanted to confirm that Action was not planning to use GFE, especially in view of Action's access to GFE. It is evident, therefore, that the contracting officer was "attempting to resolve any uncertainty concerning ... terms and conditions of the proposal" when he required that Action state in writing that no government furnished equipment would be used in the performance of this contract. FAR 15.-610(c)(3).

The following colloquy at trial corroborates defendant's assertion that its contracting officer sent out the second BAFO to Action Company in order "to attempt to resolve any uncertainties concerning the ... terms ... of the proposal." FAR 15.-610(c)(3).

MR. STINSON: At the time—middle of February (1986) when you decided to conduct these discussions, was there another matter which you felt needed discussion? Would you care to testify to that?

CONTRACTING OFFICER: Well, by virtue of the fact that I knew that Action Manufacturing Company had produced a similar item, and also by virtue of the fact that I knew that they had government-furnished equipment in their plant, [I] wanted to make certain that, in fact, it was not an omission, and, in fact, none was going to be utilized for this particular contract, because, again, it was a competitive situation, and I wanted to be cautious and make sure that all factors were utilized in determining the successful offer.

MR. STINSON: And was this done—was the authority for this action Section 610? (FAR 15.610)

CONTRACTING OFFICER: The authority for this action is Section 610 (FAR 15.610) and more specifically, to para-

graph (b) (FAR 15.610(b)). And it was a *judgment* call in my part.

MR. STINSON: Once you decided to conduct discussions, what do the regulations require you to do?

\* \* \* \* \* \*

CONTRACTING OFFICER: FAR 15.-610(c)

\* \* \* \* \* \*

MR. STINSON: What does that provide that you shall do?

CONTRACTING OFFICER: The contracting shall (1) control all discussions; (2) advise the offerer (sic) of deficiencies in its proposal so that the offerer (sic) is given an opportunity to satisfy the government's requirements; (3) *attempt to resolve any uncertainties concerning* the technical proposal and other *terms and conditions of the proposal;* (4) resolve any suspected mistakes by calling them to the offerer's (sic) attention as specifically as possible without disclosing the information concerning other offerer's (sic) proposal, or evaluation process.

\* \* \* \* \* \*

MR. STINSON: Once you decided to conduct these discussions, what did you do next?

CONTRACTING OFFICER: Once I decided to conduct these discussions, I issued a request for best and final offers.

MR. STINSON: Which request for best and final offers?

CONTRACTING OFFICER: This was the second best and final offers. (February 25, 1986)

MR. STINSON: What is your authority for doing this?

CONTRACTING OFFICER: The authority for issuing a best and final offer or any number beyond the first best and final offer is established on that same page, FAR–15.611 entitled "Best and Final Offers".

Tr. 201–04. (Emphasis supplied.)

In view of the above testimony wherein the contracting officer explained his actions pursuant to FAR 15.610 and 15.611, we are satisfied that the contracting officer had a rational basis for his actions taken pursuant to the context and the issuing of his second February 25, 1986 BAFO.

*Action's Interpretation of the February 25, 1986 TWX as an Amendment to the Solicitation.*

■ Action interpreted their February 25, 1986 TWX as an amendment of the original RFP thereby eliminating the option of any offeror from using GFE in performing the contract, consequently eliminating Rexon as a competitor with respect to this RFP, resulting in plaintiff remaining as the sole-source offeror. Action's arguments are predicated upon two factors: (1) that TWXs have been used by AAMCCOM in the past, with Action, to amend RFPs; and (2) that the February 25, 1986 TWX to Action contained the words *"It is required that you state in writing that no government furnished equipment will be used in the performance of this contract."* Action understood this statement to mean that *all* offerors would be required to state in writing that no government furnished equipment could be used in the performance of this particular contract. Therefore, Action interpreted the second BAFO, of February 25, 1986, as an amendment to the original RFP. We disagree with Action's interpretation of the February 25, 1986 second BAFO.

In examining the first January 17, 1986 BAFO TWX which was an amendment to the RFP, one immediately discerns the difference between it and the second February 25, 1986 TWX BAFO—that is the first January 17, 1986 TWX contained the language *"solicitation as modified"* to indicate that its RFP had been amended. The second February 25, 1986 TWX BAFO did *not* contain this language. This patent difference alone should have been sufficient to alert plaintiff that the second February 25, 1986 BAFO was not an amendment to the RFP.

Moreover, the effect of plaintiff's interpretation of the second BAFO, eliminating Rexon and making the plaintiff the sole source offeror, is directly contrary to the

spirit and intent of the Competition in Contracting Act of 1984 ("CICA"). Pub.L. No. 98–369, 98 Stat. 1175 (1984). For instance, Senate Report 98–50, which accompanied S. 338, The Competition in Contracting Act of 1984, states *inter alia:*

> Increased product quality and reliability are potential benefits of competition, especially when performance and quality are included in the solicitation as production award criteria. A long-term benefit of competition, moreover, is enhanced mobilization capability and industry responsiveness .... *Competition maintains the integrity* in the expenditure of public funds by *ensuring that government contracts are awarded on* the basis of *merit rather than favoritism.* (Emphasis supplied.)

Senate Report 98–50, p. 3.

House Report 98–1157, which accompanied H.R. 5184, The Competition in Contracting Act of 1984, also states, *inter alia:*

> Except under specific, well-defined circumstances, the bill *requires* the use of *full and open competition* as the *primary method of procurement.* (Emphasis supplied.)

House Report 98–1157, p. 18

In addition, according to the testimony of the contracting officer, clauses H–13 and M–6 of the RFP, both of which set forth a detailed description of how the offeror is to propose the use of government furnished equipment in the pricing of their offers, as well as a detailed evaluation of the formula to be used in the evaluation of these offers, have never been deleted from a government RFP.

The following colloquy of testimony adduced at the trial regarding this matter is eluminating:

> CONTRACTING OFFICER: I have held a warrant. A warrant defines a contracting officer. I've been a contracting officer for four and one-half years.

> *       *       *       *       *       *

> MR. STINSON: In your experience, then, with these types of contracts, have you ever seen a *clause H–13?* Well, first of all, is this a standard clause of the solicitation?

> CONTRACTING OFFICER: It's a standard clause, and in fact, appears in all solicitations as a standard practice.

> MR. STINSON: *Have you ever seen this clause ... deleted in any contract?*

> CONTRACTING OFFICER: *I've never seen this clause deleted from any contract.*

> MR. STINSON: If you would please, turn your attention to *clause M–6.* This is page 81 of the corrolated pages.

> *       *       *       *       *       *

> MR. STINSON: Mr. Kwinski, what does this clause deal with?

> CONTRACTING OFFICER: In relation to clause H–13, if a contractor so determines that he "conditions" ... his proposal based upon the use of government equipment, then, this is the clause which is used to determine the evaluation factor associated to his bid price. The evaluation factor is made up of various sub-factors which are on the following page.

> *       *       *       *       *       *

> MR. STINSON: Is this a standard clause of this type of solicitation?

> CONTRACTING OFFICER: It's a standard clause.

> MR. STINSON: In your experience in dealing with these type of solicitations, *have you ever seen this clause to be deleted from a solicitation?*

> CONTRACTING OFFICER: *I have never seen this clause deleted, no.* (Emphasis supplied.)

Tr. 189–91.

Moreover, Mr. Peterson, the assistant director of contracts at Action, also admitted to the court, that in all his years of experience, he had never seen the option to use GFE deleted from a government contract:

> THE COURT: Have you ever seen any other contract in your experience where the government has required that you not use government furnished equipment?

> *       *       *       *       *       *

MR. PETERSON: No .... Tr. 110, 127–28.

We therefore find that because (1) the February 25, 1986 TWX BAFO did not include the language "solicitation as modified" (2) because the contracting officer and Action's director of contracts testified that they had never seen the two paragraphs for the utilization of government furnished equipment, H–13 and M–6, deleted from any RFP, and (3) because plaintiff's interpretation of the February 25, 1986 TWX BAFO runs directly contrary to the spirit and intent of CICA, we find that plaintiff's interpretation of the February 25, 1986 TWX BAFO to be unreasonable. We find also, *a priori*, that the government did not amend the RFP by virtue of its February 25, 1986 TWX BAFO.

CONCLUSION OF LAW

For the foregoing reasons, we conclude that the relevant actions of defendant's procurement officials, during the negotiation process of Request For Proposal No. DAAA09–85–0744, had a rational and reasonable basis. We further conclude that plaintiff's interpretation of the February 25, 1986 TWX BAFO was unreasonable, and that the defendant, in issuing its February 25, 1986 TWX, did not amend its original RFP.

It is therefore hereby ORDERED that: (1) Plaintiff's motion for a preliminary injunction is DENIED; (2) Plaintiff's motion for a permanent injunction is DENIED; (3) The complaint is to be DISMISSED; and (4) Each party is to bear its own cost.

FINDINGS OF FACT

1. Plaintiff is Action Manufacturing Company ("Action"), a Pennsylvania corporation located in Philadelphia, Pa. Complaint at 1. Action is in the business of manufacturing various armament and munition related items for the U.S. Government. Transcript of Proceedings ("Tr.") at 162–63.

2. Defendant is the United States, acting through its agent, the U.S. Army, Armament, Munitions and Chemical Command ("AAMCCOM"). Defendant's Answer.

3. Defendant/intervenor is Rexon Technology Corporation ("Rexon"), located in Wayne, New Jersey. Rexon is in the business of manufacturing fuzes and safety arming devices, primarily for the U.S. Government. Tr. at 241.

4. On August 9, 1985, AAMCCOM issued Request for Proposals No. DAAA09–85–R–0744 (the "RFP") Joint Exhibit ("Jt.") 1; Tr. at 110.

5. As originally issued, the RFP related to the acquisition of 413,058 fuze PDM 739A MPTS (fuzes) units and 51,629 S & A Mod Assembly F/155 M285 (mod assembly) units. Jt. 1 at 7–13; Tr. at 110, 185, 242.

6. The RFP was issued and conducted pursuant to competitive negotiation and restricted procurement to only Mobilization Base Producers. Jt. 1 at 2.

7. The delivery schedule under the contract requires the first deliveries of fuzes 360 days after the award of the contract. Jt. 1 at 9. Deliveries are to continue on a monthly basis (approximately 30,000 a month) until 690 days after award of the contract. *Id.* at 9–11. Delivery of one half of the mod assemblies is required 360 days after award, completion of delivery of the remaining half is to occur 390 days after award. *Id.* at 11–12. The contract permits 240 days for the completion of First Article Testing, if it is required. *Id.* at 8.

8. Clause H–13 of the RFP permits offerors to propose the use of Government Furnished Equipment ("GFE") in the pricing of their offers. Jt. 1 at 43–44. Clause H–13 also requires offerors to state whether the offer is predicated upon the use of GFE. *Id.*; Tr. at 111–13, 187–88, 211. There is no requirement in the RFP, however, that offerors who do *not* intend to use GFE explicitly state so in their offer. Jt. 1. Clause H–13 merely requires that an offeror using GFE affirmatively state that intention. Tr. at 201. There is no place on the solicitation where the offeror can state affirmatively that it is not using GFE. *Id.*

9. Where the contractor intends to use GFE, it must obtain written authorization from the procuring contract officer with responsibility for the equipment. Tr. at 112–13, 211.

10. Clause M–6 of the RFP sets forth a detailed evaluation formula to be used in the evaluation of offers predicated upon the use of GFE. Jt. 1 at 109–11. Inasmuch as offerors using GFE have lower capital expenditures because they possess Government property, a use evaluation factor is added to the unit cost of the fuzes and mod assemblies if GFE is used. The use evaluation factor is intended to equalize any potential economic advantage that an offeror using GFE has over an offeror not using GFE. Tr. at 113, 188. The use evaluation factor discussed in Clause M–6 of the solicitation is computed based on the amount of GFE that an offeror is planning to use in the performance of the contract. The figure is not developed by the Government and is unique to each offeror. Tr. at 190–91.

11. Proposals under the RFP were due to be received by September 10, 1985. Jt. 1 at 4.

12. Action submitted a timely proposal on September 27, 1985, which was *not* based on the use of GFE. Because Action did not contemplate the use of GFE, no evaluation factor was added to Action's unit price. Jt. 2 at 25; Tr. at 114–16.

13. Action's initial proposal was made on an "all or none" basis, meaning that the offeror will accept only a complete award of the quantities solicited. Jt. 2 at 8.

14. Action communicated its intention not to use GFE by not supplying the information required by clause H–13 of those planning to use GFE. Thus, Action did not calculate an evaluation factor or submit a letter of authorization permitting the use of GFE. Tr. at 116, 212.

15. AAMCCOM performed a pre-award survey at Action's facility on October 18, 1985. Tr. at 115.

16. After submission of proposals in September 1985, but before an award of the contract was made, the Government's requirements for fuzes and mod assemblies changed. The quantity of fuzes was increased to 456,904 and the quantity of mod assemblies was decreased to 37,416. Jt. 3.

17. On January 17, 1986, the contracting officer sent telegraphic messages (TWX) to each of the offerors advising them of the change in quantities required under the contract and requesting each offeror to submit best and final offers ("BAFO"). Jt. 3; Tr. at 192.

18. The January 17, 1986 TWX contains the following language:

> Request that this office be provided a written best and final offer in accordance with the terms and conditions established in the solicitation *as modified by the following quantity changes* .... (Emphasis supplied.)

Jt. 3; Tr. at 116–19, 193.

19. The January 17, 1986 TWX served as an amendment to the solicitation. Jt. 3; Tr. at 120, 193–94. Solicitations are typically amended through several means, including a TWX. Tr. at 120, 152–54, 210.

20. Action submitted its first BAFO on January 31, 1986 and confirmed that its first BAFO was in accordance with the solicitation and the telegraphic notice of changed quantities. Action's first BAFO was *not* predicated on the use of GFE as no GFE evaluation factor was included. Jt. 4; Tr. at 120.

21. Rexon's first BAFO was based on the use of GFE and included a revised GFE evaluation factor. Defendant's Exhibit Appendix ("App.") of July 2, 1986 at 141; Tr. at 244.

22. The contracting officer determined that the first BAFO submitted by Rexon which was premised on the use of GFE, was unclear to the extent that it was impossible to accurately apply the use evaluation factor. The problem centered around whether the use evaluation factor was to be applied to both items and whether the amount of the use evaluation factor was the same for both items in the solicitation. The contracting officer determined that be-

cause of the problem with Rexon's first BAFO, an additional round of negotiations and a second BAFO was necessary. App. at 141; Tr. at 194–201.

23. The contracting officer further determined that the second BAFO was necessary to confirm that Action was *not* planning to use GFE, despite their access to it. Tr. at 202; 212–13.

24. Following the contracting officer's decision to issue a request for a second BAFO, the contract specialist handling the procurement contacted both Action and Rexon by telephone on February 25, 1986, to inform them that AAMCCOM was requesting a new BAFO, due on February 28, 1986. App. at 141; Tr. at 121–22.

25. During the telephone conversation on February 25, 1986, Action was informed that the new BAFO was necessary to "clarify an ambiguity with regard to government furnished equipment." Tr. at 122.

26. On February 26, 1986, the contracting officer sent a TWX to both Action and Rexon requesting a BAFO. App. 142; Jt. 5, 6; Tr. at 122.

27. Each TWX contained the following language:

Request that this office be provided a second best and final offer *in accordance with the terms and conditions established in the solicitation.* (Emphasis supplied.)

Jt. 5, 6.

28. A portion of the text of the messages sent to Action and Rexon differed. In particular, the February 25, 1986 TWX to Action included the following language:

It is required that you state in writing that no government furnished equipment will be used in the performance of this contract.

Jt. 5.

29. The contracting officer included this language in Action's TWX because he wanted to confirm that Action was not planning to use GFE, especially in view of Action's access to GFE. Tr. at 206–07.

30. The February 25, 1986 TWX to Rexon, however, included the following language, in lieu of the language quoted in Finding No. 28:

It is required that you state in writing the GFE factor for each CLIN [001 and 002] and the figures used in the compilation of the factors.

Jt. 6.

31. The contracting officer included this language in Rexon's TWX because Rexon had predicated its previous offers on the use of GFE. App. at 141; Tr. at 207.

32. There is no specific language in either TWX issued on February 25, 1986 indicating that it was intended as an amendment. Jt. 5, 6. Indeed, no terms were identified as being altered or deleted. Finally, it did *not* contain the words in the January 17, 1986 first BAFO, i.e., "solicitation as modified", which did indicate an amendment to the RFP. *Id.;* Tr. at 157–59.

33. Action interpreted their February 25 TWX as a modification of the RFP eliminating the option of using GFE in performing the contract, thereby effectively eliminating Rexon as a competitor with respect to this RFP. Tr. at 123–25; 165–67. Action felt that the February 25 TWX therefore substantially improved their competitive position by eliminating Rexon, the only competitor, from competitive range. Tr. at 140–41.

34. Because Action believed the language of the TWX was unambiguous, Action did not inquire of AAMCCOM as to whether the TWX prohibited the use of GFE. Tr. at 141–43.

35. Proceeding on its belief that no offeror could use GFE in formulating its second BAFO in response to the February 25, 1986 TWX, Action submitted its BAFO in a timely manner and stated in writing that it would not use GFE. Jt. 7.

36. Action has never been involved in a situation where the government has deleted the option of using GFE under Clauses M–6 and H–13. Tr. at 125–28; 159–60.

37. As a result of the February 25 TWX, Action became concerned that Rexon

would be permitted to bid without GFE and subsequently attempt to obtain authorization to use it after award, thereby avoiding the use of an evaluation factor in its proposal.

38. On February 26, 1986, Action protested the second BAFO to the Comptroller General. In its protest, Action voiced its concern that the second request for BAFO was an attempt to allow an offeror who had previously indicated it would use GFE to eliminate its use to avoid adding the evaluation factor to its offer and thereby render it the low bidder. Jt. 8 at 2; Tr. at 143–44, 167.

39. Rexon interpreted its February 25 TWX to mean that it had the option of bidding either with our without GFE. Tr. at 249.

40. Rexon submitted an offer in response to the February 25 BAFO which was based on the use of GFE. Tr. at 244.

41. Rexon is capable of performing the work required by the RFP without the use of GFE and without the purchase of additional equipment. Tr. at 244–45.

42. The Comptroller General of the United States denied Action's protest on June 12, 1986.

43. Action has approximately $50 million/year in gross sales. The contract in issue, therefore, amounts to 10% of Action's yearly gross sales. Tr. at 164.

44. Action's failure to obtain the contract would result in the layoff of 10% of its staff. Tr. at 168.

45. Rexon would have to release 30 percent of its work force and would lose one-third of its annual revenues if it is not awarded the contract at issue. Tr. at 245. Loss of this contract also would affect Rexon's ability to compete for other government contracts. Tr. at 245–46.

46. Paragraph H–13 of the RFP is entitled "Government Property" and reads in pertinent part as follows:

It is the policy of the Department of the Defense that a fair share of the cost of government production and research property shall be recovered, whether on a DOD foreign military sale (FMS) or direct commercial sales except Canada, where such property is being used in the performance of services for the manufacture of articles for foreign countries or international organizations. Therefore, rent-free use of property held under a facility's contract cannot be granted for production of requirements identified in this solicitation as FMS requirements. The desired recoupment of the rental charge to be paid to the United States government is to be included in the offeror's price (if the solicitation includes FMS requirements, and Additive Item is included in Section B for pricing the rental charged).

*Use of Government Production and Research Property in Offeror's Possession.*

The government offers such property in the offeror's possession on the condition that its use in production of the item(s) covered by the solicitation will Not interfere with production or programs scheduled having a greater priority. No use of government production and research property is authorized unless such use is approved in writing by the contracting officer having cognizance over the property. Use may be "without charge, rent-free" or on a rental (including lease) arrangement basis.

Where government-owned production and research property held in a privately owned plant under a facility's contract will be utilized for production of FMS requirements, such use must be on a rental basis even though a rent-free use may be authorized for other than FMS production. Rent will be charged at the rates set forth in the Use and Charges Clause (FAR 52.245–9) and shall be paid by the contractor by check made payable to the office designated for contract administration.

If the offeror plans to use any item of government production and research property (including any item of special tooling covered by a special tooling clause) in possession of the offeror and his proposed subcontractors' under a facilities contract or other agreement with

the government independent of this solicitation, the offeror shall so indicate by checking the box below and by identifying such facilities contract or other agreement under which the property is held.

47. Paragraph M-6, "Evaluation Procedures for Use of Government Owned Production and Research Property" reads in pertinent part as follows:

A. For purposes of equalization of the competitive advantage resulting from rent-free use of government-owned production and research property, such use shall be evaluated by adding to the price of item(s) the following rates for each month of the proposed production period. Where both rental use and rent-free use will occur during the same production period, the rent and the evaluation in lieu of rent for rent-free use will be computed in accordance with the formula for proration set forth in the Use and Charges Clause, FAR 52.245–9.

\* \* \* \* \* \*

(1) The age of each item of the facilities shall be based on the year in which it was manufactured, with an annual birthday on 1 January of each year thereafter. On 1 January following the date of manufacture, the item shall be considered one-year old; and on each succeeding January 1st, it shall become one year older. For example, if an item of equipment is manufactured on 15 July 1958, it will be considered to be one year old on 1 January 1959; two years on 1 January 1960; and 3 years old on January 1 1961; and so forth. The item of equipment will be considered over two years old and after 1 January 1960; over six years old on and after 1 January 1964; and over ten years old on after 1 January 1968.

(2) For land and land preparation, buildings, building installations, and land installations other than those items specified in (1) above, a fair and reasonable rental shall be established, based on sound commercial practice.

(3) For personal property and equipment not covered in (1) or (2) above, a rental shall be established at not less than the prevailing rate, if any; or in the absence of such rate not less than 2% per month for electronic test equipment and automotive equipment; and not less than 1% per month for all other property and equipment.

(b) The number of months that will be used for the purpose of this evaluation, unless otherwise agreed to by the offeror and the contracting officer, will be computed as follows:

the delivery schedule in the solicitation will be used to ascertain the number of months of rent-free use that will be computed in the evaluation. The time frame will be from the first day of the month of initial production (or first article submission, if required), and continue through the month scheduled for final delivery.

(c) the offeror shall submit the use-evaluation factor, per unit procured, computed as follows:

$$\frac{T \times R \times P \times S}{Q} = C$$

T = total acquisition cost (including cost of transportation and installation paid by the government) of facilities.

R = Rental rate

P = Production period (months)

Q = Quantity of items to be procured.

S = Prorata share, if applicable.

C = Evaluation factor to be added to unit price.