SHIELDS ENTERPRISES, INC., d/b/a
SEI Information Technology,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 549–86C.

United States Court of Federal Claims.

May 27, 1993.

Richard W. Smith, Lincoln, NE, of record for plaintiff.

John S. Groat, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, DC, with whom were attorneys in the Dept. of Justice, and the Asst. Atty. Gen., of record for defendant.

### *OPINION*

HORN, Judge.

### *BACKGROUND*

This case is before the court on defendant's motion for summary judgment and on plaintiff's cross-motion for partial summary judgment. Plaintiff, Shields Enterprises, Inc., d/b/a SEI Information Technology (Shields), filed this action pursuant to 28 U.S.C. § 1491 (1982).

Plaintiff alleges that defendant, acting through the Social Security Administration (SSA), breached an implied contract to con-sider plaintiff's proposal in a fair and honest manner, thereby violating Federal Acquisition Regulation 48 C.F.R. § 15.605(e) (1984), and 41 U.S.C. § 253b(a) (Supp. II 1984). Plaintiff alleges that SSA failed to evaluate its offer fairly by applying evaluation criteria not specified in the Request for Proposals (RFP) and that SSA improperly cancelled the procurement. According to plaintiff, defendant evaluated its proposal using a Technical Evaluation Rating Plan (Rating Plan) which differed materially from the evaluation criteria set forth in the RFP. Plaintiff opposes summary judgment on the issue of the propriety of the evaluation of the RFP. Plaintiff argues, however, that it is entitled to partial summary judgment, asserting that SSA improperly cancelled the RFP because the reasons relied on were not in existence at the time the RFP was cancelled. Defendant contends that it is entitled to summary judgment on the whole case because the plaintiff has failed to demonstrate that SSA's actions when evaluating the proposals received were unreasonable and that, regardless of the evaluation process, Shields has not proven that SSA improperly cancelled the solicitation.

After careful consideration of the briefs filed by the parties, the oral argument on the cross-motions for summary judgment, and for the reasons discussed below, the court GRANTS defendant's motion for summary judgment and DENIES plaintiff's cross-motion for partial summary judgment.

### *FACTS*

On March 7, 1985, the Social Security Administration (SSA) issued solicitation number SSA–RFP–85–0196, titled "Data Base Architecture." The solicitation was for two subprograms of a Data Base Integration Program, which was part of a larger effort known as the Systems Modernization Plan, intended to modernize SSA's data processing systems. The two subprograms related to data base system software development and a portion of the database restructuring. The RFP sought a contractor "to design, develop, and imple-

ment the components of the target data base architecture and to develop a detailed transition plan for migrating SSA's applications software to the data base operating environment." The RFP anticipated the use of a cost-plus-fixed-fee contract. SSA estimated that the work would take four years and would cost $9,800,000.00.

On April 24, 1985, the closing date for the RFP, SSA received five proposals, including the response from plaintiff Shields. On May 20, 1985, SSA's Technical Evaluation Committee, which was responsible for evaluating all technical aspects of the five proposals received, informed the contracting officer of its completed technical evaluation. The Committee concluded that all five of the proposals received were technically unacceptable "... primarily because no offeror provided evidence which demonstrated experience relevant to the requirements of this Statement of Work." The Technical Evaluation Committee's "Summary of Evaluations" gave plaintiff the following scores:

| Criteria | Points Received | Possible Points |
| --- | --- | --- |
| Related Organizational Experience | 4.4 | 40 |
| Personnel Qualifications | 7.8 | 40 |
| Technical Approach | 3.44 | 10 |
| Project Management & Staffing Plan | .80 | 10 |
| Total Points | 16.44 | 100 |

The pertinent parts of the narrative included in the evaluation of the offer submitted by plaintiff Shields read as follows:

The offeror's description of experience does not appear to be similar in nature to the requirements of the Statement of Work (SOW). The offeror failed to provide substantive information about numbers of transactions or file sizes to assess level of complexity of projects. The largest project cited involved an average of 13 technical personnel, or only about one-third the anticipated peak for this project.

Directly related to organizational experience is the experience of proposed personnel. Since organizational experience was not evident and since resumes focused on the projects cited under organizational experience, the score for personnel qualifications was directly affected.

In addition, three key people noted as technical advisors were proposed as part-time (15 hours per week).

The offeror's schedule does not honor due dates defined in the SOW. The offeror discusses a 3–month delay in major deliverables due at the end of year one but does not discuss how time is recouped to enable delivering year two products on time.

The offeror refers to establishing a small project office (up to 5 people) locally but the majority of the work will be done at its home office in Chicago, which raised a question about the amount of actual interaction of the project team and SSA's technical staff. Only Tasks II and III (the AIF and DBE) were assigned individual team leaders; all other tasks were bundled together under one person which did not seem reasonable to the TEC. The breakdown of work months by labor category followed the same pattern so that it is impossible to determine whether resources were appropriately assigned for anything other than Tasks II and III. Finally, SEI is a small firm and it seemed doubtful to the TEC that SEI could devote one-fourth to one-third of its technical staff to this project.

The Source Selection Evaluation Board, by memorandum also dated May 20, 1985, notified the Source Selection Advisory Council of the Technical Evaluation Committee's evaluation, recommended that solicitation number SSA–RFP–85–0196 be cancelled, and suggested that the procurement be suspended pending a reassessment of the requirement. The Evaluation Board's memorandum concluded: "The Board does not consider that any of the offers are capable of being made acceptable through discussions and therefore recommends that the RFP be cancelled and that the procurement be suspended pending a reassessment of the requirement." Thereafter, the Source Selection Advisory Council, in a letter, likewise dated May 20, 1985, recommended to the Source Selection Official, "that solicitation number SSA–RFP–85–0196 for the Data Base Architecture Project be cancelled and that the pro-

curement be suspended pending a reassessment of the requirement." Consequently, on May 20, 1985, the Social Security Administration Division of Contracts & Grants Management issued Amendment Number One cancelling solicitation number SSA–RFP–85–0196, in its entirety. The contracting officer, then, sent a letter on May 23, 1985 to all offerors, notifying them that each of their proposals had been determined unacceptable.

In a letter, dated June 6, 1985, Richard J. Weiland, the Secretary of Shields, notified the contracting officer that plaintiff formally protested the determination by SSA that plaintiff's proposal was unacceptable, protested SSA's cancellation of the RFP, requested that the solicitation be reinstated, and requested that Shields' proposal be reconsidered. In the alternative, plaintiff requested that Shields be reimbursed for bid preparation costs. Plaintiff also requested a status conference with the contracting officer regarding the cancellation. Discussions were held by telephone on June 11, 1985 and June 12, 1985 between Richard Weiland and the contracting officer, followed on June 28, 1985, by a meeting between the contracting officer, Weiland, and the President of Shields, T. Russell Shields. Subsequently, on July 2, 1985, there was another meeting between the contracting officer, T. Russell Shields, Weiland, and the chairperson of the SSA Technical Evaluation Committee. In a detailed letter dated July 23, 1985, however, the contracting officer denied the protest brought by Shields.

On August 9, 1985, plaintiff filed a protest with the General Accounting Office (GAO), contesting the cancellation of the RFP and requesting that GAO order the procurement be reinstated. In the alternative, plaintiff asked for reimbursement of its bid preparation costs. The Comptroller General denied the protest. *SEI Information Technology*, Comp.Gen.Dec. B–219668 (Dec. 12, 1985) 85–2 C.P.D. ¶ 649. In denying the protest, the Comptroller General relied on a September 30, 1985 GAO report to Congress, prepared for the Chairman of the Committee on Government Operations of the House of Representatives. The report was titled "Social Security Administration's Computer Systems Modernization Effort May Not Achieve Planned Objectives."

The Comptroller General, in his December 12, 1985 decision, relied on explanations outlined in the GAO report to support the denial of the protest filed by Shields and concluded:

> Our review of the comments on individual evaluators scoresheets persuades us that SSA's evaluation applied a requirement for experience with prior projects virtually identical in scope and size to that contemplated under the RFP. We note, for instance, that at least one evaluator gave SEI [Shields] no points for either organizational experience or personnel qualifications for the sole reason that SEI's previous data bases had not been as big as SSA's data base. In our view, this was a considerably more stringent requirement than vendors might reasonably have anticipated, particularly when the qualifying "experience in the development of large, complex data bases ... will receive high scores" language of the RFP is considered. As discussed above, SEI had experience in the development of a large data base using similar technology. SEI, however, received a technical score of only 16.44 out of a possible 100. In our judgment, this low score was substantially attributable to the application of a single criterion—affecting 80 percent of the technical evaluation—which was inconsistent with the RFP's stated evaluation scheme.
>
> We believe, however, that *the RFP was properly cancelled.* As we pointed out [in our Special Report dated September 30, 1985] ... SSA had not performed much of the underlying work needed to support the effort contemplated by this RFP, and the scope of work will have to be changed. This provides a reasonable basis for cancelling the procurement without regard to the propriety or impropriety of the evaluation.... Our report also points out that SSA has reassessed its approach, has determined to perform some of the work in-house, and is [currently] preparing a new RFP reflecting

these considerations. We will not question the cancellation on this basis, since the decision whether work should be performed in-house or by a contractor is a matter of executive branch policy that is not within our bid protest function. [Citation omitted.]

Since we do not find that SSA lacked a proper basis for the cancellation of this procurement, there is no legal basis upon which SEI might be allowed to recover its proposal preparation costs. [Citation omitted.] [Emphasis added.]

On December 30, 1985, Shields sought reconsideration of the Comptroller General's December 12, 1985 decision. On April 23, 1986, the Comptroller General rejected plaintiff's request for reconsideration and affirmed its initial findings. *SEI Information Technology—Reconsideration,* Comp. Gen.Dec. B–219668.2 (Apr. 23, 1986) 86–1 C.P.D. ¶ 393.

Plaintiff, therefore, filed its complaint in the United States Claims Court, followed by plaintiff's amended complaint. The case was temporarily suspended at the suggestion of defendant's counsel to allow the parties to include additional materials. in the record, which were filed with the court on August 3, 1992.

## DISCUSSION

### Summary Judgment

■ Summary judgment in this court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of this court is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is

similar in language and effect.[1] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of this court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Associates, Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991).

■ Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [judge] could return a verdict for the non moving party." *Id.; see also Unig Computer Corp. v. United States,* 20 Cl. Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial.

---

**1.** By enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, the United States Claims Court was renamed the United States Court of Federal Claims. In accordance with General Order 33 issued by the United States Court of Federal Claims, the court adopted the rules of the United States Claims Court. The substance of the rules of the court, discussed herein, are unaffected by the legislation, other than with respect to the name change of the court and, therefore, the name change of the rules. However, General Order 33 also indicates that if there is a conflict between the new

statute and the rules, the statute will control. RUSCC stands for Rules of the United States Claims Court, now the Rules of the United States Court of Federal Claims, which is abbreviated RCFC.

In general, the Rules of this court are closely patterned upon the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the Rules of this court, including Rule 56. *See Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, and if the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If the moving party makes either showing, the burden is placed on the nonmoving party to show that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If, under no scenario, can the nonmoving party present the evidence to support its case, then there

should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

Under Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to show that a genuine issue for trial exists. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553.

■ In the instant case, both parties have filed motions for summary judgment. Defendant has filed for summary judgment on the entire case and plaintiff has filed for partial summary judgment. The fact that both parties have moved for partial or full summary judgment, based on the alleged absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). *See also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). The court must evaluate each

party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

In the case at bar, plaintiff maintains that SSA acted arbitrarily and capriciously by applying criteria during the evaluation which were materially different from the criteria announced in the RFP. Plaintiff also alleges that the defendant acted arbitrarily when it cancelled the RFP. Plaintiff contends that defendant should not be allowed to justify its cancellation of the RFP by reasons which plaintiff claims were not in existence at the time the RFP was cancelled, but which, according to plaintiff, were later advanced by GAO in its report to Congress. Defendant has moved for summary judgment on the case as a whole. Plaintiff has cross-moved for summary judgment on the cancellation issue, but opposes summary judgment on the evaluation issue, asserting that there are material questions of fact in dispute regarding whether the defendant acted arbitrarily and capriciously when evaluating the proposals received.

*Review of an Agency Procurement Decision*

■ Judicial review of an agency's procurement decisions is limited in scope. *Magnavox Elec. Sys. Co. v. United States*, 26 Cl.Ct. 1373, 1380 (1992); *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 818 (1989), aff'd, 914 F.2d 271 (Fed.Cir.1990); *Drexel Heritage Furnishings, Inc. v. United States*, 3 Cl.Ct. 718, 721 (1983); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). Frustrated bidders, however, have a right to seek redress in the federal courts for alleged arbitrary or capricious actions on the part of contracting officers. *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). Moreover, great deference is accorded to agency procurement decisions. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971); *RADVA Corp. v. United States*, 17 Cl.Ct. at 818. It is through a narrow lens that this court is charged with determining whether the government has satisfied the implied contrac-

tual condition that each offer received by the government in response to a request for proposals will be fairly and honestly evaluated. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 909 (Fed.Cir. 1988); *National Forge Co. v. United States*, 779 F.2d 665, 667 (Fed.Cir.1985); *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1573 (Fed.Cir.1983); *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed.Cir.1983); *Skytech Aero, Inc. v. United States*, 26 Cl.Ct. 251, 253–54 (1992); *Data Transformation Corp. v. United States*, 13 Cl.Ct. 165, 171 (1987); *Dynalectron Corp. v. United States*, 4 Cl.Ct. 424, 428, aff'd, 758 F.2d 665 (Fed.Cir.1984); *Space Age Eng'g, Inc. v. United States*, 4 Cl.Ct. 739, 741 (1984).

■ In order to recover bid preparation costs, the evidentiary standard to be applied is a stringent one. *Tidewater Management Servs., Inc. v. United States*, 216 Ct.Cl. 69, 73, 573 F.2d 65, 67 (1978). In *Space Age Engineering v. United States*, the court wrote: "Recovery may be had only upon *'clear and convincing proof'* that award of the contract to another was arbitrary and capricious, thereby denying a contractor's bid the fair and impartial consideration to which it was entitled." (Emphasis added.) *Space Age Engineering, Inc. v. United States*, 4 Cl.Ct. 739, 741–2 (1984); *see also Paxson Elec. Co., Inc. v. United States*, 14 Cl.Ct. 634, 638 (1988); *Heyer Prod. Co. v. United States*, 135 Ct. Cl. 63, 71, 140 F.Supp. 409, 414 (1956). Therefore, in order to recover bid preparation costs, an unsuccessful bidder must prove that the government breached its implied contractual obligation to consider a proposal fairly due to the government's arbitrary and capricious treatment of the bidder's offer. *Coastal Corp. v. United States*, 713 F.2d at 730; *Keco Indus. Inc. v. United States (Keco II)*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974); *see Robert F. Simmons & Assocs. v. United States*, 175 Ct.Cl. 510, 515, 360 F.2d 962, 964 (1966) (quoting *Heyer Prod. Co. v. United States*, 135 Ct.Cl. at 71, 140 F.Supp. at 414); *Joseph L. DeClerk & Assoc., Inc. v. United States*, 26 Cl.Ct. 35, 41 (1992). As stated by the United States Court of

Appeals for the Federal Circuit, a court will not find a breach by a government official and intervene unless it has been clearly determined that the agency in reaching its determination acted in an arbitrary and capricious manner when it rejected plaintiff's bid. *CACI, Inc.—Federal v. United States*, 719 F.2d 1567, 1573 (Fed.Cir.1983); *Coastal Corp. v. United States*, 713 F.2d at 730; *Magnavox Elec. Sys. Co. v. United States*, 26 Cl.Ct. 1373, 1380 (1992); *Skytech Aero, Inc. v. United States*, 26 Cl.Ct. 251, 254 (1992); *Tidewater Management Servs., Inc. v. United States*, 216 Ct.Cl. at 72, 573 F.2d at 67; *Excavation Constr. Inc. v. United States*, 204 Ct.Cl. 299, 302, 494 F.2d 1289, 1290 (1974); *Keco Industries, Inc. v. United States (Keco II)*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1984); *Keco Industries, Inc. v. United States (Keco I)*, 192 Ct.Cl. 773, 782, 428 F.2d 1233, 1238 (1970).

*The Evaluation of the Offers Received*

In *Keco II*, the Court of Claims undertook "... to develop rules and standards for judicial review of the various administrative steps in the process, and the scope of the duties owed at each stage by the Government to the allegedly aggrieved participant." *Keco Indus.*, 203 Ct.Cl. at 574, 492 F.2d at 1203 (*Keco II*). The *Keco II* court set forth four factors to be considered when determining whether the government acted arbitrarily or capriciously towards a bidder-claimant: 1) whether there was subjective bad faith on the part of the procuring officials, thus depriving the bidder of fair and honest consideration of its proposal; 2) whether there was a reasonable basis for the government's decision; 3) the degree of discretion given to the procurement officials by applicable statutes and regulations which, under *Keco II*, determines the degree of proof of error necessary for recovery; and, 4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the basis for recovery, but which need not automatically constitute grounds for such recovery. *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04. Moreover, as stated in *Keco II:* "The application of these four general principles may well depend on (1) the type of error or dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to claimant's own bid or that of a competitor."

In *Tidewater Management Services, Inc.*, the United States Court of Claims amplified the analytical framework established in *Keco II*, by which a plaintiff in order to recover bid preparation cost must prove that the government's action was arbitrary and capricious. The *Tidewater* court stated:

> Arbitrary and capricious action on the part of the Government may be shown by proof that there existed no reasonable basis for the award of the contract to another. *Continental Business Enterprises, Inc. v. United States, supra*, 196 Ct.Cl. [627] at 637–38, 452 F.2d [1016] at 1021 [(1971)]; *Keco Industries (II) v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974). Subjective bad faith on the part of the procuring officials is such proof. *Heyer Products Co. v. United States, supra; Keco Industries (II) v. United States, supra.* Proof that the procuring officials violated 'pertinent statutes or regulations can, but need not necessarily, be a ground for recovery.' *Keco Industries (II) v. United States, supra*, 203 Ct.Cl. at 574, 492 F.2d at 1204.

*Tidewater Management Servs., Inc.*, 216 Ct.Cl. at 73, 573 F.2d at 67.

In plaintiff's motion for partial summary judgment and opposition to defendant's motion for summary judgment, plaintiff points out that: "The bidder-claimant need only show that one of the four *Keco II* criteria exists to allow recovery in a wrongful cancellation of a RFP case." According to the plaintiff, the crux of its *Keco* argument relies on Criteria (2) and (4):

> The ultimate standard is whether the Government's conduct is arbitrary and capricious. The *Keco II* criteria outlined the above-described four *different instances* in which a governmental agency would be regarded as arbitrary and capricious. In the instant case, SEI [plaintiff Shields] submits that the government

engaged in a violation of two criteria for allowing a recovery by a bidder-claimant under *Keco II*. *First*, the SSA did not have a reasonable basis for the decision to cancel the RFP because SSA used a materially different criterion for evaluation of SEI's proposal, as compared with the criterion set out in the RFP. (*Keco II* second criterion for allowing a recovery by the bidder-claimant) *Secondly*, the use of an outside evaluation criteria not set out in the RFP to evaluate the proposal of SEI violated a Federal Acquisition Regulation, 15.605(e), applicable to SSA. (*Keco II* fourth criterion for allowing a recovery by the bidder-claimant) Also, the SSA, in the instant case, violated a federal statute, 41 USCS § 253b(a). [Emphasis in original.]

Defendant's position, however, is that under the applicable burden of proof, SSA's actions during the evaluation of plaintiff's proposal were reasonable, and were not arbitrary or capricious under the second criterion of *Keco II*, because (1) the rating plan reflected the requirements in the RFP, (2) the evaluation was conducted in accordance with the requirements of the RFP, and (3) plaintiff's proposal was properly found to be technically unacceptable. The defendant also argues that regardless of the propriety or impropriety of the evaluation process, SSA, nonetheless, acted properly when it cancelled the RFP.

■ To succeed under the first criterion of *Keco II*, and to recover bid preparation costs, plaintiff must demonstrate subjective bad faith upon the part of defendant, which deprived the bidder of fair and honest consideration of its proposal. *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04; *Heyer Prods. Co. v. United States*, 135 Ct.Cl. 63, 71, 140 F.Supp. 409, 414 (1956). This court has previously stated that: "In proving that the government acted in bad faith, the claimant must show specific intent to injure the plaintiff, for example, by predetermining the awardee or by harboring a prejudice against the plaintiff." *Contract Custom Drapery Serv., Inc. v. United States*, 6 Cl.Ct. 811, 817 (1984).

Further, in considering a claim of bad faith against the government, there is a strong presumption that government officials acted properly. *See Eagle Constr. Corp. v. United States*, 4 Cl.Ct. 470, 479 (1984); *P. Francini & Co. v. United States*, 2 Cl.Ct. 7, 11 (1983); *Burroughs Corp. v. United States*, 223 Ct. Cl. 53, 64–65, 617 F.2d 590, 597 (1980); *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978). To overcome this presumption, the law requires 'well-nigh irrefragable proof.' *See American General Leasing v. United States*, 218 Ct.Cl. 367, 374, 587 F.2d 54, 59 (1978); *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954). *See also P. Francini & Co., supra*, 2 Cl.Ct. at 11; *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). *Id. See also Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 198–99, 543 F.2d 1298, 1302 (1976), *cert. den.*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977) (stating that "[i]n the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff.")

■ Although plaintiff alleges in its complaint that the defendant failed to exercise good faith when evaluating plaintiff's proposal and when cancelling the Request for Proposals in violation of the *Keco II* criteria, after reviewing plaintiff's complaint and supporting papers, the court agrees with defendant that plaintiff has not substantiated its allegation of bad faith on the part of the government. There is no evidence that the government specifically intended to injure the plaintiff, or that the government operated with any prejudice toward the plaintiff.

Because of the interdependence of the second, third and fourth *Keco II* criteria, they are best addressed together, starting with criterion three, then criterion four, and ending with a discussion of whether under the second criterion, defendant acted arbitrarily or capriciously during the evaluation of plaintiff's proposal. According to the second criterion set forth in *Keco II*,

plaintiff may be granted relief if it can demonstrate that the governmental agency lacked a reasonable basis for its action in the procurement. *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04; *Continental Business Enters. v. United States*, 196 Ct. Cl. 627, 637–638, 452 F.2d 1016, 1021 (1971). Plaintiff must prove that there was "... clearly no reasonable basis for the official action ..." in order to recover bid preparation costs. *Keco II*, 203 Ct.Cl. at 576, 492 F.2d at 1205. *Keco II* criterion three addresses the level of proof required to demonstrate arbitrary and capricious actions by procurement officials, as affected by the degree of discretion exercised by the contracting officer. *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04. *Keco II* criterion four allows recovery in certain, but not all, cases in which there was a clear and prejudicial violation of a statute or regulation by the government in rejection of the bidder's proposal.

As with the first criterion set out in *Keco II*, the plaintiff, in its motion for partial summary judgment and in opposition to defendant's motion for summary judgment, does not seem to fully discuss the third *Keco II* criterion. The third *Keco II* criterion indicates that the level of proof required for plaintiff to demonstrate that the defendant acted arbitrarily or capriciously during the procurement activity in question, under the second *Keco II* criterion, is related to the amount of discretion entrusted to the procurement officials. Courts other than the *Keco II* court have also endorsed the principle that the more discretion granted to the contracting officer, the greater the amount of proof needed to show that the government official's actions were arbitrary and capricious. *Lincoln Servs., Ltd. v. United States*, 230 Ct.Cl. 416, 427, 678 F.2d 157, 163–64 (1982); *Continental Business Enters.*, 196 Ct.Cl. at 637–38, 452 F.2d at 1021 (1971); *Hayes Int'l Corp. v. United States*, 7 Cl.Ct. 681, 685 (1985) ("the degree of proof necessary to overturn procurement determinations is related to the amount of discretion vested in the administrative official whose actions are challenged").

This court repeatedly has endorsed the notion that the contracting officer is entitled to great latitude, reasoning that the contracting officer's "authority to manage the contract is broad". *NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 377 n. 7 (Fed.Cir.1986). Moreover, the wide discretion accorded contracting officers extends to a broad range of procurement functions. For example, the court in *Hayes Int'l Corp. v. United States* stated "[i]t is well-established that the contracting official has a considerable degree of discretion in arriving at a responsibility determination." *Hayes Int'l Corp. v. United States*, 7 Cl.Ct. at 685. In *Action Mfg. Co. v. United States*, 10 Cl.Ct. 474, 478 (1986), the court noted that contracting officials have broad discretion to obtain the contract most beneficial to the government. In *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985), the court endorsed the principle that: "contracting officers may appropriately exercise wide discretion in their evaluation of bids and their application of procurement regulations."

Defendant argues that procurement officials had exceptionally broad discretion in the case at bar because it involved a negotiated procurement. In *Drexel Heritage Furnishings v. United States*, 7 Cl.Ct. 134, 142–43 (1984) *aff'd*, 809 F.2d 790 (Fed.Cir. 1986), the court stated:

> In weighing whether a contracting officer acted in an irrational or unreasonable manner, the court must consider whether the procurement was formally advertised or negotiated. Here it was negotiated, and it is axiomatic that negotiated procurements require, in fact, demand, that the contracting officer be allowed more leeway or discretion in the decision-making process, than if the contract was formally advertised. *Keco Industries, Inc. v. Laird*, 318 F.Supp. 1361 (D.D.C. 1970).

*See also, Action Mfg. Co.*, 10 Cl.Ct. at 478; *Drexel Heritage Furnishings, Inc.*, 7 Cl. Ct. at 142–43; *Electro–Methods, Inc.*, 7 Cl.Ct. at 762; *Hayes Int'l Corp. v. United States*, 7 Cl.Ct. at 685; *DeMat Air, Inc. v. United States*, 2 Cl.Ct. 197, 202 (1983).

The fourth criterion, enunciated in *Keco II,* allows plaintiff to recover bid preparation costs, in certain cases, if it successfully proves there was a clear and prejudicial violation of a statute or regulation in the government's rejection of a proposal. *Keco II,* 203 Ct.Cl. at 574, 492 F.2d at 1203–04; *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725–26 (1987), *aff'd,* 854 F.2d 464, 466 (Fed.Cir.1988); *Northern Telecom Inc. v. United States,* 8 Cl.Ct. 376, 379 (1985); *Aviation Enterprises, Inc. v. United States,* 8 Cl.Ct. 1, 19–20 (1985). A proven violation of a regulation may, but need not necessarily, provide a basis for recovering costs expended in the preparation of a proposal. *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. at 726, *aff'd,* 854 F.2d 464 (Fed.Cir.1988); *Keco II,* 203 Ct.Cl. at 574, 492 F.2d at 1204. A mere conclusion that there is a breach of a statute is not enough. To recover bid preparation costs, a plaintiff must be able to show that the statutory or regulatory breach was prejudicial to consideration of its proposal. The court in the *CACI* case stated that the plaintiff "must show that a violation [of statute or regulation] denied it the impartial consideration to which it was entitled under the implied contract obligations of the government." *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. at 726 (quoting *Arrowhead Metals, Ltd. v. United States,* 8 Cl.Ct. 703, 714 (1985) (citations omitted)).

Plaintiff claims that SSA violated Federal Acquisition Regulation § 15.605(e), and acted arbitrarily and capriciously, by using criteria materially different than those set forth in the RFP as issued. As stated by this court previously, "Both the FAR [Federal Acquisition Regulations] and the CICA [Competition in Contracting Act] require evaluation factors and significant subfactors to be clearly stated within the RFP, including a statement of the relative importance of such factors and subfactors." (citations omitted.) *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 726 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). The applicable Federal Acquisition Regulations (FAR) state:

15.605 Evaluation factors.

(a) The factors that will be considered in evaluating proposals should be tailored to each acquisition and include only those factors that will have an impact on the source selection decision.

(b) The evaluation factors that apply to an acquisition and the relative importance of those factors are within the broad discretion of agency acquisition officials.

\*    \*    \*    \*    \*    \*

(e) The solicitation shall clearly state the evaluation factors that will be considered in making the source selection and their relative importance (see 15.406–5(c)). Numerical weights, which may be employed in the evaluation of proposals, need not be disclosed in solicitations. The solicitation shall inform offerors of minimum requirements that apply to particular evaluation factors.

48 C.F.R. § 15.605 (1984).

In certain types of cases, generally larger procurements, such as the instant one, agencies utilize a procedure known as formal source selection. In these circumstances, the FAR prescribes that:

15.612 Formal source selection.

(a) General. A source selection process is considered 'formal' when a specific evaluation group structure is established to evaluate proposals and select the source for contract award. This approach is generally used in high-dollar-value acquisitions and may be used in other acquisitions as prescribed in agency regulations. The source selection organization typically consists of an evaluation board, advisory council, and designated source selection authority at a management level above that of the contracting officer.

48 C.F.R. § 15.612 (1984). The FAR also contemplates the use of a Source Selection Plan to aid evaluators in determining which proposal best meets the government's requirements. The FAR adds:

(c) Source Selection Plan. As a minimum, the plan shall include—

(1) A description of the organization structure;

(2) Proposed presolicitation activities;

(3) A summary of the acquisition strategy;

(4) A statement of the proposed evaluation factors and their relative importance;

(5) A description of the evaluation process, methodology, and techniques to be used; and

(6) A schedule of significant milestones.

48 C.F.R. § 15.612(c) (1984). Additionally, the FAR contemplates that the source selection decision will reflect the evaluation factors established in the solicitation:

(d) Source Selection Decision. The source selection authority shall use the factors established in the solicitation (see 15.605) to make the source selection decision.

\*    \*    \*    \*    \*    \*

(2) The supporting documentation prepared for the selection decision shall show the relative differences among proposals and their strengths, weaknesses, and risks in terms of the evaluation factors. The supporting documentation shall include the basis and reasons for the recommendation.

48 C.F.R. § 15.612(d) (1984).

Nevertheless, Professors Nash and Cibinic have observed that the government has a great deal of discretion in how source selection information is presented in the request for proposals, as follows:

There is a great deal of discretion accorded to the contracting officer in the way that this information is presented in the RFP. The goal is to insure equal and intelligent competition, [citations omitted] and provide offerors sufficient information to submit an intelligent proposal, ... [citations omitted] The test is whether the language in the RFP adequately informs the offerors of the way the evaluation factors will be used to make the source selection decision.

One way to meet this requirement would be to include the entire source selection plan in the RFP. While some agencies have used this technique, the most common practice is to include only a description of the plan in the RFP. In the past there has been considerable controversy about whether inclusion of the entire plan in the RFP was required when both the weighting and scoring systems were numerical. The Comptroller has since held that such disclosure of exact numerical weights is not necessary, *Sperry Rand Corp.,* Comp. Gen. Dec. B–179875, 74–2 CPD ¶ 158 (1974), *aff'd in part,* 75–2 CPD ¶ 42 (1975), and the FAR reflects this conclusion....

John Cibinic, Jr. and Ralph C. Nash, Jr., *Formation of Government Contracts* 562–63 (1986). The courts also have held that "precise numerical weight to be used in the evaluation need not be disclosed." *CACI Field Services, Inc. v. United States,* 13 Cl.Ct. 718, 726, *aff'd,* 854 F.2d 464 (Fed.Cir.1988).

In the instant case, although precise numerical weights were not disclosed in the RFP to which plaintiff Shields responded, the RFP outlined Evaluation Criteria in order of numerical importance.

*Article II—Technical Evaluation Criteria*

The technical evaluation factors, listed below in descending order of importance, to be used in the evaluation of the technical proposals submitted for this requirement, are....

a.  *Related Organizational Experience*

\*    \*    \*    \*    \*    \*

b.  *Staff Personnel Qualifications*

\*    \*    \*    \*    \*    \*

c.  *Technical Approach*

\*    \*    \*    \*    \*    \*

d.  *Project Management and Staffing Plan*

\*    \*    \*    \*    \*    \*

Specifically, in its motion for partial summary judgment, plaintiff maintains that the government "used a materially different criterion for evaluation of SEI's proposal [regarding Related Organizational Experience], as compared with the criterion set out in the RFP", and that "the use of an outside evaluation criteria not set out in the

RFP to evaluate the proposal of SEI violated a Federal Acquisition Regulation. . . ."

The pertinent part of the RFP, titled Technical Evaluation Criteria, states:

a. *Related Organizational Experience* Offerors will be evaluated on previous relevant organizational experience in the performance of work of similar size, complexity, and scope. Experience in the development of large, complex data base systems and the transition of automated data processing systems to data base systems will be assessed and will receive high ratings. Quality, responsiveness, and timeliness in performing such prior related work will be evaluated. SSA will evaluate information in this area provided by the offeror as well as information that may be acquired from other Government agencies and private sector sources.

The Technical Evaluation Rating Plan (Rating Plan),[2] which was not disclosed to the offerors, elaborated on how the members of the Technical Evaluation Committee should evaluate the offers on the Related Organizational Experience requirement. The pertinent part of the Rating Plan reads:

*Criterion 1: Related Organizational Experience*
The general background, experience, and qualifications of the offeror should be furnished in the proposal. Relevant experience must be furnished, . . . . Experience may have been with the Federal government, commercial, and/or non-profit organizations. Special notation will be made of any similar or related government projects. The offeror should furnish the time required to complete each of the projects, staffing used, and the total price charged for the performance. Offerors should indicate any record of previous or current efforts similar to this project, as well as current capacity to undertake *similar* endeavors. Offerors should indicate if they intend to subcontract elements of the Statement of Work and, if so, how this subcontracted activity will be administered.

Offerors will be evaluated on previous experience in conducting similar assignments. For example, a *similar* assignment would be one which entailed the centralized system integration of data stored at multiple sites, managed by dissimilar DBMS's, with millions of entity occurrences, interactive transaction rates in the tens of thousands per day, and included batch processing; however, a project which entailed a central data base accessed by multiple terminals with limited local storage would not be considered comparable. [Emphasis in original.]

A side-by-side comparison of the language of the Related Organizational Experience evaluation criterion included in the RFP to the language of the Rating Plan section on Related Organizational Experience demonstrates that plaintiff's claim has no merit. The elements included in each document can be summarized as follows:

| Related Organizational Experience Evaluation Criteria in RFP | Related Organizational Experience Section in Technical Evaluation Rating Plan |
| --- | --- |
| Offerors will be evaluated on previous relevant organizational experience | Similar area of work for past contracts related to the work required in this RFP; |
| performance of work of similar size, complexity, and scope. | Contracts showed similar size/complexity |
| Experience in the development of large, complex data base systems and the transition of automated data processing systems to data base systems will be assessed and will receive high ratings. | particularly, the design, development, and implementation of Data Base Management Systems, transition of automated data processing systems to a DBMS environment. |
| Quality, responsiveness, and timeliness in performing such prior related work will be evaluated. | Indications of technical quality, responsiveness, and timeliness of previous related activities and the ability to solve unforeseen technical or contractual problems. |

2. This document, dated March 25, 1985, labeled "Administrative—Confidential Procurement Sensitive" and titled "Data Base Architecture Technical Evaluation Rating Plan," was not disclosed to the public.

After comparing the language of the two documents side by side, and comparing the concepts described, it appears to this court that the RFP and the Technical Evaluation Rating Plan contain substantially the same language and call for the same analysis by the evaluator.

The deposition testimony of Stephen Kautsch, a branch chief in the Division of Data Administration and the chief technical expert on the Technical Evaluation Committee and of Wanda Poetker, the project officer and chairperson of that committee, demonstrates that committee members understood the relationship of the RFP and of the Rating Plan. Poetker testified that the Rating Plan, which she developed, was to be used as guidance for the Technical Evaluation Committee in their consideration of what was "similar experience." In explaining the application of the plan, Poetker stated, "This again was used as a guide. I mean, these words were not taken verbatim as what had to be in any given proposal to award points." When asked "whether anyone ever instructed you that the technical evaluation plan had priority over other criteria set out in the solicitation," Kautsch replied, "[t]o my knowledge, no." Kautsch testified that when he evaluated the proposals, he understood that he was required to evaluate each proposal in strict conformity with the technical evaluation criteria of the RFP.

Plaintiff also argues that the Technical Evaluation Committee based its review of plaintiff's proposal on requirements not included in the RFP by erroneously requiring offerors to demonstrate that they had experience with "large, very complex database systems," as large as the system contemplated by the Social Security Administration. Plaintiff asserts that although it

had broad experience in the fields described in the RFP, it still received low ratings from the Technical Evaluation Committee because the Technical Evaluation Committee was improperly "caught up in a concept that the offerors must have had organizational experience with systems equal in size with SSA's system." Despite the fact that the Comptroller General denied plaintiff's protest and upheld the validity of SSA's cancellation of the RFP, plaintiff urges the court to adopt the reasoning in that first Comptroller General opinion, dated December 12, 1985, in support of its position that the RFP and Rating Plan included different criteria which resulted in plaintiff's low ratings. The pertinent words of the first Comptroller General's opinion read as follows: [3]

*Our review of the comments on individual evaluators scoresheets persuades us that SSA's evaluation applied a requirement for experience with prior projects virtually identical in scope and size to that contemplated under the RFP. We note, for instance, that at least one evaluator gave SEI no points for either organizational experience or personnel qualifications for the sole reason that SEI's previous data bases had not been as big as SSA's data base. In our view, this was a considerably more stringent requirement than vendors might reasonably have anticipated, particularly when the qualifying "experience in the development of large, very complex data bases ... will receive high scores" language of the RFP is considered. As discussed above, SEI had experience in the development of a large data base using similar technology. SEI, however, received a technical score of only 16.44 out of a possible 100. In our judgment, this low score was substan-*

**3.** As indicated above, the plaintiff also requested reconsideration of the December 12, 1985 GAO decision. Plaintiff's request for reconsideration was denied on April 23, 1986.

*tially attributable to the application of a single criterion—affecting 80 percent of the technical evaluation—which was inconsistent with the RFP's stated evaluation scheme.*[4]

We believe, however, that the RFP was properly canceled. As we pointed out in our report, cited above, SSA had not performed much of the underlying work needed to support the effort contemplated by this RFP, and the scope of work will have to be changed. This provides a reasonable basis for canceling the procurement without regard to the propriety or impropriety of the evaluation. [Citations omitted.] Our report also points out that SSA has reassessed its approach, has determined to perform some of the work in-house, and is preparing a new RFP reflecting these considerations. We will not question the cancellation on this basis, since the decision whether work should be performed in-house or by a contractor is a matter of executive branch policy that is not within our bid protest function. [Citations omitted.]

Since we do not find that SSA lacked a proper basis for the cancellation of this procurement, there is no legal basis upon which SEI might be allowed to recover its proposal preparation costs. [Citations omitted.]

The protest is denied. [Emphasis added.]

The underscored language in the decision, cited immediately above, is, however, not entirely clear. The first of the underlined sentences from the Comptroller General's decision might be understood as stating that the requirements in the RFP and those used by the evaluators were the same; or, the words can be read, as plaintiff would have us do, to indicate according to the decision, the evaluators compared each proposal received as to whether the prior experience of that offeror was with projects virtually identical to the project contemplated in the RFP by SSA.[5]

Defendant, however, asserts that the Rating Plan in the instant case is consistent with the language of the RFP, and that the Rating Plan was developed in order to assist the Technical Evaluation Committee to evaluate the requirements set out in the RFP, including the nature of what constitutes "similar" experience. Defendant maintains that the Plan was provided for use by the Technical Evaluation Committee in conjunction with the RFP, and merely elaborated on the criteria already set forth in the RFP.

Defendant notes that the RFP gave notice to the offerors that SSA was seeking a company with experience in handling a system similar in size and complexity to SSA's system. According to defendant, the related organizational experience requirement

---

**4.** Plaintiff also argues that it received a low score both for the "Staff Personnel Qualifications" criterion and the "Related Organizational Experience" criterion simply because the two criteria were so closely related. Plaintiff points out that SSA's Rating Plan allocated a possible 100 evaluation points divided as follows: (1) forty percent allocated to "Related Organizational Experience" (2) forty percent allocated to "Personnel Qualifications" (3) ten percent allocated to "Technical Approach" and (4) ten percent allocated to "Project Management and Staffing Plan". Plaintiff asserted in its Proposed Findings of Uncontroverted Fact that:

The evaluation criterion primarily at issue in this suit, and the one assigned most weight by the RFP, is the one dealing with 'related organizational experience.' The Government claims that the second criterion, addressing the experience of proposed personnel, is directly *related to the primary one.* [Citations omitted.] Accordingly, low scores for experi-

ence would result in correspondingly low scores for personnel. (Emphasis in original.)
Plaintiff contends that the government did not explain the direct relationship between the "Related Organizational Experience" and "Personnel Qualifications" criteria in the RFP. Plaintiff argues that because of the interrelationship between the criteria for "Related Organizational Experience" and for "Staff Personnel Qualifications," the two criteria taken together accounted for eighty percent of the overall possible points.

**5.** Because the holding of the GAO decision was to validate the cancellation of the RFP, even if the language in the Comptroller General's decision should be read to mean that the evaluation of the proposers' past experience was technically flawed, the language is the equivalent of dicta. Moreover, the GAO decision, although persuasive, is not binding on this court. See, *Honeywell, Inc. v. United States,* 870 F.2d 644, 649 (Fed.Cir.1989).

was to be considered in the context of the entire solicitation, which contained an extensive statement of work and a technical report prepared by Computer Corporation of America, giving a detailed description of the nature of the system sought by the government. Defendant contends, therefore, that it should have been evident to the prospective offerors from the language and context of the RFP, and from the indication that the criteria would be valued in descending order with Related Organizational Experience at the top of the list, that SSA would place a great deal of value on prior experience with sophisticated and comprehensive data base architecture in order to qualify for the contract award. Defendant argues that in describing what would be considered "similar" experience, the Rating Plan "simply integrated the RFP's elements into a whole and applied approximate numerical concepts to them in order to suggest relative size and complexity." Defendant likewise states, "[t]he plan did

nothing more than further define the elements of the RFP in numeric terms; it contained no new information, no new elements, no hidden criteria deliberately contrived to deceive offerors."

The Rating Plan directly addressed the concept of a "similar," prior assignment, as follows:

Offerors will be evaluated on previous experience in conducting similar assignments. For example, a *similar* assignment would be one which entailed the centralized system integration of data stored at multiple sites, managed by dissimilar DBMS's, with millions of entity occurrences, interactive transaction rates in the tens of thousands per day, and included batch processing; however, a project which entailed a central data base accessed by multiple terminals with limited local storage would not be considered comparable. The evaluator will give specific attention to the following:

| | Qualitative Rating | Weight | |
|---|---|---|---|
| (1) Similar area of work for past contracts related to the work required in this RFP; particularly the design, development, and implementation of Data Base Management Systems, transition of automated data processing systems to a DBMS environment. | _____ × | 2.0 | = |
| (2) Contracts showed similar size/complexity and required similar personnel skills for the effort being proposed. | _____ × | 1.0 | = |
| (3) Indications of technical quality, responsiveness, and timeliness of previous related activities and the ability to solve unforeseen technical or contractual problems. | _____ × | 1.0 | = |
| TOTAL | | | = |

At the time the RFP was issued, SSA clearly understood that there were few other entities using systems of equal size to that needed by SSA, so that SSA would not have been requiring identical experience in order to qualify a proposer for award. In his deposition, Stephen Kautsch, of the Technical Evaluation Committee, stated:

We discussed the fact that we were not looking for a company that had transactions and numbers of records at the magnitude that SSA had because we knew there were a limited number of other companies out there that would have our volume, but we were looking at something that was relatively large to give us some sort of idea of what was done in

that environment. If we have hundreds of millions of records, we were looking for something in the 50 to 10 million [range].

Based on Stephen Kautsch's testimony, it appears that SSA evaluators did not base their judgment only on whether the offeror had experience with a system as large as its own. Kautsch credibly set forth his reasons for concluding that each of the companies cited by plaintiff in its proposal as examples of previous similar experience did not meet the RFP requirements for "similar size, complexity and experience."

The record further reveals that although SSA evaluators who reviewed the proposals received in response to the RFP were concerned that plaintiff had not demonstrated experience with projects of similar size and complexity, they did not appear to set a standard of requiring experience with projects of identical or equal size. On the evaluation sheets submitted by the evaluators, each commented on plaintiff's proposal as follows:

Evaluator 1—

"The 'largest' project involved an average of 13 technical personnel or only about ⅓ the anticipated peak load of the project."

Evaluator 2—

"no similar projects,
no multiple DBMS's,
very small files"

Evaluator 3—

"Did not relate to contracts of similar size and/or complexity"

Evaluator 4—

Although the copy of the evaluation notes in the record is difficult to read, the evaluator estimated that plaintiff's previous projects, while similar in structure to the SSA projects, were between 3% and 17% of the size of the SSA project, and processed no more than 50% of the transactions required by the SSA system.

■ It is not the role of the courts to step into the shoes of the evaluators and make a technical assessment of the merits of a plaintiff's proposal submitted in response to an RFP. The government evaluators are entitled to the presumption of the regularity of government proceedings accorded to government decisionmakers, including contracting officers. Unless their actions are documented as being arbitrary and capricious, which plaintiff has not shown here, the decisions of procurement officials should not be overturned by the courts. In *CACI Field Servs., Inc. v. United States*, the court noted that the standard of review in pre-award cases is very narrow and that procurement officers may properly exercise wide discretion in their evaluation of bids and application of procurement regulations. The court stated:

Although this court possesses the authority to grant complete equitable and monetary relief in pre-award government contract cases brought by disappointed bidders, 28 U.S.C. § 1491(a)(3) (1982), the standard of review in such cases is extremely limited. Contracting officers may properly exercise wide discretion in their evaluation of bids and in their application of procurement regulations.

*CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. at 725, *aff'd*, 854 F.2d 464 (Fed. Cir.1988) (footnote omitted). In *Baird Corp. v. United States*, the court stated:

Judicial review of an agency's preaward procurement decision is, and should be, extremely limited in scope. The court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable. It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's determinations.

*Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983).

■ After reviewing the record in the case currently before this court, the court finds that, contrary to plaintiff's contentions, the Rating Plan did no more than elaborate on the criteria included in the RFP. The Rating Plan served to explain to the Technical Evaluation Committee how it should process proposals under the criteria set forth in the RFP. The RFP clearly stated the need for experience in the devel-

opment of large, complex data base systems. Moreover, all offerors were aware that, due to its need for enormous information storage, SSA would require a massive system, capable of handling extremely complex interactive transactions. Therefore, all offerors, including the plaintiff in this case, were on notice as to the importance of such experience and of the need for project personnel who could handle such a large assignment. This court does not believe that the RFP misled or failed to give sufficient information to the plaintiff. Therefore, this court finds that the government's evaluation, and, as is discussed more fully below, the cancellation of the RFP were not arbitrary, capricious, or violative of law or regulation.

*Cancellation of the RFP*

The record regarding cancellation of the solicitation reflects that, on May 20, 1985, the Source Selection Evaluation Board notified the Source Selection Advisory Council, by memorandum, of the results of the work of the Technical Evaluation Committee. The Board recommended that the solicitation be cancelled and that the procurement be suspended "pending a reassessment of the requirement." Based on the Source Selection Evaluation Board's memorandum, the Source Selection Advisory Council, in a letter dated May 20, 1985, likewise recommended to the Source Selection Official, that solicitation number SSA–RFP–85–0196 be cancelled and that the procurement be suspended "pending a reassessment of the requirement." As a result, also on May 20, 1985, the Social Security Administration, Division of Contracts & Grants Management, issued Amendment Number One, which cancelled the solicitation in its entirety, and stated that no contract would be awarded at that time. This Amendment was not very informative. It stated:

The purpose of this Amendment Number One (1) to solicitation number SSA–RFP–85–0196 for the Data Base Architecture for the Social Security Administration (SSA) is to cancel the solicitation in its

entirety. No further information is available at this time, and no contract will be awarded resulting from this solicitation.

On May 23, 1985, the contracting officer sent a letter to all offerors, notifying them that each of their proposals had been reviewed and determined unacceptable.

Defendant, without conceding any wrongdoing, asserts that regardless of possible improprieties during the evaluation process, SSA properly cancelled the RFP. Moreover, defendant argues that this court should accord deference to the Comptroller General's decision, dated December 12, 1985, which denied plaintiff's protest on the basis that the RFP had been properly cancelled. When the Comptroller General upheld the cancellation, the decision relied on a September 30, 1985 GAO report to Congress, titled: "Social Security Administration's Computer Systems Modernization Effort may not Achieve Planned Objectives." The Comptroller General also indicated that SSA had reassessed its approach and had decided to perform some of the work in-house.[6] In relevant part, the Comptroller General concluded:

We believe, however, that the RFP was properly canceled. As we pointed out in our report, cited above, SSA had not performed much of the underlying work needed to support the effort contemplated by this RFP, and the scope of work will have to be changed. This provides a reasonable basis for canceling the procurement without regard to the propriety or impropriety of the evaluation. [Citation omitted.] Our report also points out that SSA has reassessed its approach, has determined to perform some of the work in-house, and is preparing a new RFP reflecting these considerations. We will not question the cancellation on this basis, since the decision whether work should be performed in-house or by a contractor is a matter of executive branch policy that is not within

---

6. During the deposition of Stephen Kautch, he testified that after the cancellation, SSA, in fact, did develop some of the software in-house.

our bid protest function. [Citation omitted.]

Thus, the Comptroller General held that plaintiff was not entitled to recover proposal preparation costs because the agency had properly cancelled the solicitation.

Plaintiff's motion for partial summary judgment argues that there are no material questions of fact in dispute regarding SSA's allegedly improper cancellation of the RFP. Plaintiff points to the deposition of the contracting officer, John F. Broglie, to support its contention that when SSA cancelled the RFP, defendant relied on the "technical unacceptability" of the offeror(s) as its basis for cancellation. Additionally, plaintiff points to defendant's answer in response to a pretrial Request for Admissions:

> Plaintiff's Request for Admissions, admitted the following:
>
> REQUEST 1. The Contracting Officer, Mr. John F. Broglie, had authority to cancel the Solicitation No. SSA–RFP–85–0196 on May 20, 1985 and he did cancel it on that date. On that date, the only ground or justification that Mr. Broglie and the Social Security Administration had or asserted as a basis for such cancellation was alleged 'technical unacceptability of all offerors.'
>
> RESPONSE: Admit

Plaintiff, thus, concludes that SSA did not cancel the RFP for valid reasons set forth at the time of cancellation, or for the reasons described in the September 30, 1985 GAO Special Report, and as described in the December 12, 1985 Comptroller General decision denying plaintiff relief on its protest.

Although, as discussed above, plaintiff, on the one hand, urges this court to rely on the December 12, 1985 GAO protest denial to award plaintiff bid preparation costs for defendant's alleged failure to fairly evaluate plaintiff's offer, when reviewing the cancellation issue, plaintiff argues that the government should not be allowed to rely on the GAO report. Specifically, plaintiff asserts that the two justifications for cancellation described in the GAO report, that

SSA had concluded it needed to revise the scope of work and that SSA had decided to do some of the work in-house, should not be relied on to support SSA's decision to cancel the RFP because these reasons were not known to SSA at the time of the cancellation decision.

Plaintiff contends:

> These two justifications were not, indeed could not have been, announced by either the SSA or the GAO on the date of cancellation of the RFP because this Special Report was not in existence on May 20, 1985.
>
> The GAO's Special Report dated September 30, 1985, is the only place where these additional alleged justifications are made. The SSA has never advanced these additional alleged justifications for cancellation, either at the time of the cancellation or at any time since. The SSA has never produced any documents or witnesses to attest to or evidence the existence of these other alleged justifications.

Contrary to plaintiff's assertions, the record contains evidence that SSA must have been aware of the problems with its computer processing capability and potentially with its proposed plans for solution, including the RFP requirements. For example, on July 28, 1983, Congressman Jack Brooks requested that GAO review the SSA system, and stated that SSA "is faced with an outdated computer system that can barely meet its mission." Brooks added:

> Over a year ago, SSA began implementing a $500 million plan to resolve its chronic computer problems and move SSA to state-of-the-art technology. At the time, the Committee expressed its concern that the plan may not meet SSA's needs and, even if successful, full implementation may not delay the most pressing problems facing SSA—software and personnel.... I therefore request that GAO undertake an immediate and comprehensive investigation of SSA's activities to determine if: (1) the $500 million survival plan is on schedule and is being fully implemented, (2) the software upgrade proposed in the plan is adequate

and on schedule, and (3) SSA has taken the necessary management actions to improve its personnel situation.

The GAO report dated September 30, 1985, cited by plaintiff, reveals that the Department of Health and Human Services' Inspector General, in an audit of SSA's Claims Processing System dated January 30, 1985, had found inadequacies in the system which were critical to improving SSA's ability to make program changes.

As indicated earlier, the difficulties with SSA's system came into sharp focus on May 20, 1985, when the Technical Evaluation Committee, after reviewing the five proposals received in response to the RFP, concluded that none of the proposals could be made acceptable. Both the Chairperson of the Source Selection Evaluation Board and the Chairperson of the Source Selection Advisory Council concluded and stated, utilizing the same formal words in their documentation, that "the procurement be suspended pending a reassessment of the requirement." Based on the facts in the record, it is unlikely, as plaintiff argues, that the grounds ultimately cited in the GAO report as justifying the cancellation were not known to the agency when it cancelled the RFP, only four months before the GAO report was issued.

Plaintiff also argues that the two grounds cited by GAO as justification for the cancellation of the RFP are without merit. Plaintiff tries to rebut the Comptroller General's findings that SSA had decided to perform some of the work in-house by citing to two memoranda written prior to the issuance of the RFP. In a memorandum dated November 9, 1984, the Acting Deputy Commissioner for Systems stated, "[t]his proposed contract activity represents a newly established need for contractor services for which in-house performance is not feasible. Therefore, it appears that this project is exempt from an A–76 Cost Comparative Study." In a subsequent memorandum, dated December 3, 1984, the Acting Deputy Commissioner of Management and Assessment stated, "[t]herefore, since it is also not feasible to perform in-house, your staff should pro-

ceed to acquire a contract for this project through the normal procurement channels without an A–76 cost comparison study." Although, originally, SSA had considered, but rejected, the option of performing some of the work in-house, SSA reassessed its position after the proposals in response to the RFP had been received, evaluated, and, in each case, found to be technically unacceptable.

Plaintiff asserts that the second rationale offered for cancellation, and included in the GAO report, that SSA decided to revise the scope of the work, is also without merit. Plaintiff alleges, but without offering further support or documentation, that actions of the contracting officer and SSA evaluating boards do not reflect any discussions to revise the scope of the project. Documents in the record, however, demonstrate that SSA had concluded that it needed to reassess its requirements. The statement that SSA was in the process of, or needed to reassess, the requirement appears at least three times, first, in the memorandum dated May 20, 1985 from the Chairperson of the Source Selection Evaluation Board recommending cancellation of the solicitation; second, in the memorandum, also dated May 20, 1985, from the Chairperson of the Source Selection Advisory Council to the Source Selection official; and third, in the "Deficient Procurement Request," dated May 21, 1985, signed by the contracting officer. The conclusions of the agency decisionmakers regarding the need to reassess and to cancel the contract are consistent with the GAO report that SSA had not performed much of the underlying work needed to support the effort contemplated by the RFP, that the scope of work had to be changed and that the RFP had not resulted in an offer adequate to meet the specifications detailed in the RFP.

■■■ As a general proposition, when it becomes evident that a solicitation fails to adequately reflect the government's needs, it is proper to cancel the solicitation. This is true in sealed bidding. The Federal Acquisition Regulations (FAR) state:

(c) Invitations may be cancelled before award but after opening when, consis-

tent with subparagraph (a)(1) above, the contracting officer determines in writing that—

(1) Inadequate or ambiguous specifications were cited in the invitation;

(2) Specifications have been revised;

(3) The supplies or services being contracted for are no longer required;

48 C.F.R. § 14.404–1(c) (1984). The Court of Appeals for the Federal Circuit has recognized that the government may properly cancel a solicitation when all the bids are unacceptable. *John C. Grimberg v. United States,* 869 F.2d 1475, 1483 (Fed.Cir. 1989). The government may also cancel a solicitation under competitive negotiation procedures, as in the instant case. The FAR states:

15.606 Changes in Government requirements.

(a) When, either before or after receipt of proposals, the Government changes, relaxes, increases, or otherwise modifies its requirements, the contracting officer shall issue a written amendment to the solicitation....

\* \* \* \* \* \*

(4) If a change is so substantial that it warrants complete revision of solicitation, the contracting officer shall cancel the original solicitation and issue a new one, regardless of the stage of the acquisition. The new solicitation shall be issued to all firms originally solicited and to any firms added to the original list.

According to the FAR and reaffirmed by the Court of Appeals for the Federal Circuit, in a negotiated procurement, when a change to government requirements is "so substantial that it warrants complete revision of a solicitation," cancellation of the solicitation is required. *SMS Data Prods. Group, Inc. v. United States,* 940 F.2d 1514, 1518 (1991).

■■■ A procurement official's decision to cancel a solicitation is inherently discretionary. As stated in *American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 374, 587 F.2d 54, 58–59 (1978):

It is settled law that no assurance exists that a contractor will receive an award

and that the Government retains, in its discretion, the right to reject all bids without liability, even after there have been extensive negotiations with a bidder. *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974); *Robert Simmons & Associates v. United States,* 175 Ct.Cl. 510, 360 F.2d 962 (1966).

■■■ Moreover, even if "technical unacceptability" was used as the basis for cancellation, there is support for the notion that if an agency relies upon an improper basis to cancel a procurement, the cancellation may be upheld if another proper basis for the cancellation exists which is reasonable and not an abuse of discretion. Accordingly, SSA's need to reassess its requirement, which was articulated at the time of the cancellation, is a reasonable basis for cancelling the RFP. *See Vanguard Security Inc. v. United States,* 20 Cl.Ct. 90, 110–11 (1990). In *Joseph Morton Co., Inc. v. United States,* the United States Court of Appeals for the Federal Circuit stated:

'[I]t is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown.' *Pots Unlimited, Ltd. v. United States,* 220 Ct.Cl. 405, 600 F.2d 790, 793 (1979) (citations omitted).

*Joseph Morton Co., Inc. v. United States,* 757 F.2d 1273, 1277 (Fed.Cir.1985).

### CONCLUSION

After careful review of the filings and the relevant law, the court concludes that plaintiff has failed to meet the burden of proof necessary on summary judgment to demonstrate that the proposal submitted by plaintiff was handled by the government in other than a fair and proper manner. Plaintiff has failed to do more than simply allege that SSA did not cancel the RFP based on the reasons included in the GAO report, that SSA needed to revise the scope of work and that SSA had decided to do some of the work in-house. Moreover, plaintiff has also failed to prove that defendant acted arbitrarily and capriciously when it evaluated and cancelled the solicita-

tion. For the reasons discussed above, defendant's motion for summary judgment is GRANTED, and plaintiff's cross-motion for partial summary judgment is DENIED. Plaintiff is not entitled to receive bid preparation costs.

IT IS SO ORDERED.